UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, )<br><br>Plaintiff, )<br><br>v. )<br><br>SPENCER PHARMACEUTICAL INC., )<br>JEAN-FRANÇOIS AMYOT, )<br>MAXIMILIEN ARELLA, )<br>IAN MORRICE, )<br>IAB MEDIA INC. and )<br>HILBROY ADVISORY INC., )<br><br>Defendants. ) | Case No.<br><br>JURY TRIAL DEMANDED |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission ("the Commission") alleges the following

against defendants Spencer Pharmaceutical Inc. ("Spencer"), Jean-François Amyot ("Amyot"),

Maximilien Arella ("Arella"), Ian Morrice ("Morrice"), IAB Media Inc. ("IAB Media"), and

Hilbroy Advisory Inc. ("Hilbroy"):

## PRELIMINARY STATEMENT

1.      This enforcement action concerns a "pump-and-dump" scheme whereby

defendants artificially "pumped" up the price of a publicly-traded company through the

dissemination of false positive information about the company, after which they "dumped" the

stock into the marketplace to take advantage of the artificially high stock price.  The scheme in

this case involved Spencer, a purported pharmaceutical company with addresses in Boston,

Massachusetts, and in Canada.  The scheme was orchestrated by Amyot, who was an officer of

Spencer until November 2009 and then continued to exercise control over the affairs of the company. Amyot was assisted by Arella and Morrice, who became officers and directors of Spencer in November 2009, and together they effected the "pump" of Spencer's stock price by disseminating false information about Spencer through two public relations companies that Amyot controlled (IAB Media and Hilbroy).

2.      The "pump-and-dump" started in June 2010 and accelerated in November 2010, when Spencer began issuing a string of false and misleading press releases claiming that it had received an unsolicited buyout offer from a Mideast company. Arella and Morrice worked with Amyot to create and disseminate the misleading press releases. While Spencer was issuing the press releases, Amyot, Arella, Morrice, IAB Media, and Hilbroy were conducting a promotional campaign using internet websites and newsletters to tout Spencer and the buyout offer. When Spencer announced on November 11, 2010 that the Mideast company proposed to pay $0.97 per share – or $245 million – for the company, the price of Spencer stock more than doubled in two days – opening at $0.25 per share on November 10 and closing at $0.60 per share on November 12. The daily trading volume skyrocketed as well, reaching almost six million shares traded on November 11, 2010, compared to a daily average of less than 50,000 shares during the previous three months.

3.      The proposed buyout offer was pure fiction, but Amyot's profits from dumping Spencer stock were very real. Between November 1, 2010 and April 18, 2011, Amyot sold approximately 36 million Spencer shares for gross proceeds of more than $5.8 million. Amyot and Arella also orchestrated the deposit of 12 million Spencer shares into an account controlled by Amyot through a series of transfers done to evade restrictions and securities registration

2

requirements.

4.      Through the activities alleged in this Complaint, (1) all the defendants engaged in: (a) fraud in the offer or sale of securities, in violation of Section 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act"), and (b) fraudulent or deceptive conduct in connection with the purchase or sale of securities, in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rules 10b-5(a) and (c) thereunder; (2) Spencer, Amyot, Arella and Morrice engaged in: (a) fraud in the offer or sale of securities, in violation of Section 17(a)(2) of the Securities Act, and (b) fraudulent or deceptive conduct in connection with the purchase or sale of securities, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder; (3) Arella, Morrice, IAB Media, and Hilbroy aided and abetted Spencer's violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5; (4) Amyot had control person liability for Spencer's violations of Section 10(b) of the Exchange Act, and Rule 10b-5; and (5) Spencer, Amyot, and Arella engaged in the sale of unregistered securities in violation of Sections 5(a) and 5(c) of the Securities Act.

5.      Accordingly, the Commission seeks:  (a) a permanent injunction prohibiting the defendants from further violations of the relevant provisions of the federal securities laws; (b) disgorgement of the defendants' ill-gotten gains, plus pre-judgment interest; (c) the imposition of civil penalties due to the egregious nature of the defendants' violations; (d) an order barring Amyot, Arella, and Morrice from serving as an officer or director of a public company; and (e) an order barring Amyot, Arella, and Morrice from participating in an offering of a "penny stock" as defined in Section 3(a)(51) of the Exchange Act.

## JURISDICTION

6.      The Commission seeks a permanent injunction and disgorgement as to all defendants pursuant to Section 20(b) of the Securities Act [15 U.S.C. §77t(b)] and Section 21(d)(1) of the Exchange Act.  The Commission seeks civil penalties as to all defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)].  The Commission seeks an officer/director bar as to defendants Amyot, Arella, and Morrice pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. §78u(d)(2)].  The Commission seeks a penny stock bar as to defendants Amyot, Arella, and Morrice pursuant to Section 20(g) of the Securities Act [15 U.S.C. §77t(g)] and Section 21(d)(6)(B) of the Exchange Act [15 U.S.C. §78u(d)(6)(B)].

7.      This Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§77t(d), 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), 78aa].  Venue is proper in this District because, at all relevant times, Spencer maintained an office in Boston.

8.      In connection with the conduct described in this Complaint, the defendants directly or indirectly made use of the mails or the means or instruments of transportation or communication in interstate commerce.

9.      The defendants' conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

## DEFENDANTS

10.     **Spencer** is a Delaware corporation that purports to be a pharmaceutical company based in Boston, Massachusetts, with a presence in Canada as well.  At all relevant times, its common stock was traded under the symbol "SPPH" on OTC Link (formerly, "the Pink Sheets") operated by OTC Markets Group Inc.  At all relevant times, its common stock was a "penny stock" as that term is defined in Section 3(a)(51) of the Exchange Act [15 U.S.C. §78c(a)(51)].

11.     **Amyot**, age 40, formerly lived in Quebec, Canada, but may recently have moved to the Bahamas.  He was an officer and director of Spencer until November 2009.

12.     **Arella**, age 56, lives in Montreal, Canada.  He became president, chief executive officer, and a director of Spencer in November 2009.

13.     **Morrice**, age 52, lives in Ottawa, Canada.  He became executive vice president, corporate secretary, and a director of Spencer in November 2009.

14.     **IAB Media** is a Canadian corporation controlled by Amyot.  IAB Media describes itself as a "financial advertising and consulting firm" for small-cap companies.  IAB Media had a contract to provide public relations services to Spencer.

15.     **Hilbroy** is a Canadian corporation controlled by Amyot.  Hilbroy describes itself as an "advisory and consultancy company".  Hilbroy shares an address with IAB Media, and it assisted IAB Media in its public relations activities on behalf of Spencer.

## STATEMENT OF FACTS

### The Origin of Spencer

16.     In 1998, Cortez Development Ltd. was incorporated in Delaware.  By 2008, after several name changes, the company was known as Emergensys Corp. ("Emergensys"), and Amyot was its president.

17.     In February 2008, Wolverine Oil and Gas Corp. ("Wolverine") was incorporated in Nevada, and Amyot was its only director.

18.     On May 27, 2009, Amyot filed an amendment to change Wolverine's name to Spencer Pharmaceutical Inc.  ("Spencer").

19.     On June 23, 2009, Amyot caused Emergensys to enter into a reverse merger with the newly-renamed Spencer.

20.     On July 13, 2009, Emergensys announced that it had entered into the reverse merger and that it was going to change its own name to Spencer.

21.     On November 16, 2009, Amyot resigned as vice president of Spencer, and Arella became a director and was appointed president and CEO.

22.     On November 22, 2009, Amyot resigned as a director of Spencer, and Morrice became a director and was appointed executive vice president and secretary.

23.     Although he ceased to be an officer or director of Spencer after November 2009, Amyot continued to exert control over the company's affairs.

### Spencer's Purported Business Activities and Financial Condition

24.     On August 10, 2009, Spencer entered into an "exclusive patent license agreement" with 4413261 Canada Inc., a Canadian company that claimed to have the exclusive

6

right to market U.S. Patent 2007/0077305-A1, which concerns methods to accelerate the human body's absorption of certain drugs. Arella and Morrice signed the agreement for both Spencer and 4413261 Canada Inc.

25.     In reality, U.S. Patent 2007/0077305-A1 had not been approved. One of the scientists listed on Spencer's Scientific Advisory Board applied for patent 2007/0077305-A1, but the U.S. Patent and Trademark Office ("PTO") denied the application.

26.     On November 2, 2009, Spencer entered into a research contract with certain scientists at the Université du Québec à Montréal ("the UQAM"), ostensibly to develop the technology covered by Patent 2007/0077305-A1. The contract required Spencer to pay a total of $300,000 to the UQAM in six installments between November 2009 and May 2011. Arella signed the contract for Spencer.

27.     On December 22, 2009, Amyot caused Hilbroy to loan $50,000 to Spencer, which used the money for the first required payment to the UQAM.

28.     On February 10, 2010, a chartered accountant in Montreal released audited 2009 financial statements for Spencer. The balance sheet indicated that Spencer had assets of $57,600 (supposedly related to the patent), liabilities of $57,600 (primarily the $50,000 loan from Hilbroy), and a "shareholders' deficit" of more than $17 million (meaning that investors had supposedly put more than $17 million into the company without receiving a return, although there is no evidence that Spencer had ever received the money). The earnings statement indicated that Spencer had no revenue in 2009.

29.     On April 22, 2010, Amyot caused Hilbroy to loan $50,000 to Spencer, which used the money for the next required payment to the UQAM.

7

30.     On May 8, 2010, the chartered accountant released an interim financial statement for Spencer for the first quarter of 2010. The interim statement indicated that Spencer's financial condition had barely changed since the audited 2009 financial statements prepared in February 2010. The interim statement also indicated that Spencer had no revenue and no operating expenses in the first quarter of 2010.

31.     On May 11, 2010, Amyot caused Hilbroy to loan $50,000 to Spencer, which used the money for the next required payment to the UQAM.

32.     On August 20, 2010, the chartered accountant released an interim financial statement for Spencer for the second quarter of 2010. The interim statement indicated that Spencer had assets of $108,028 (supposedly related to the patent), liabilities of $217,050 (accounts payable, accruals, and loans from an "affiliated company" – *i.e.*, Hilbroy), and a purported shareholders' deficit of more than $17 million. The interim statement also indicated that Spencer had no revenue and a net loss of $112,892 in the second quarter of 2010.

33.     On October 13, 2010, Amyot caused Hilbroy to loan $50,000 to Spencer, which used the money to make the next required payment to the UQAM.

34.     On November 3, 2010, the chartered accountant released an interim financial statement for Spencer for the third quarter of 2010. The interim statement indicated that Spencer had assets of $111,532 (supposedly related to the patent), liabilities of $303,855 (accounts payable, accruals, and loans from an "affiliated company" – *i.e.*, Hilbroy), and a purported shareholders' deficit of more than $17 million. The interim statement also indicated that Spencer had no revenue and a net loss of $188,660 in the third quarter of 2010.

**Issuance of Spencer Common Stock**

35.    On November 22, 2009, Spencer entered into a letter agreement with Morrice

whereby Morrice would receive $10,000 per month as executive vice president and $2,000 per

month as a director.  In addition, a company controlled by Morrice received 2.5 million shares of

Spencer common stock as a signing bonus.

36.    On November 26, 2009, the Spencer Board of Directors approved the issuance of

209 million shares of common stock.  The recipients included:

> Arella – 36 million shares;
>
> Hilbroy – 24 million shares;
>
> Cunningham-Adams Small Cap Fund ("Small Cap Fund"), an investment
> fund controlled by Amyot – 23 million shares; and
>
> Finkelstein Capital ("Finkelstein"), a Canadian corporation ostensibly
> owned by Amyot's brother but actually controlled by Amyot – 22 million
> shares.

None of the recipients had made investments in Spencer that would have justified the issuance of

millions of shares of the company's stock.

**The Beginning of the "Pump and Dump" Scheme**

37.    As of 2009, Amyot had the practice of taking control of small, micro-cap

companies, using IAB Media and Hilbroy to promote the companies in order to boost the stock

price, and then selling his stake in the companies for a profit.

38.    On December 10, 2009, Spencer and IAB Media entered into a "securities

awareness agreement" whereby IAB Media agreed to prepare press releases, arrange for

publicity on the internet, and prepare research reports on Spencer in exchange for 24 million

shares of common stock.  The agreement was signed by Arella for Spencer and by Amyot for

IAB Media.

39.     On March 8, 2010, Spencer filed an Initial Company Information and Disclosure

Statement with the OTC, a document required for its listing on OTC Links.  The Disclosure

Statement, which Arella signed as President and CEO, described the company in glowing terms:

> The Company is a newly formed company specializing in a controlled
> release of existing therapeutics molecules in order to potentially
> increase their bio-availability and systemic efficacy in the challenging
> area of drugs delivered to the Central Nervous System through an
> innovative approach that allows the crossing of the blood-brain barrier
> and potentially reduce the side effects of drugs used for neurological
> diseases and brain cancer....

> [The company is] a multi-disciplinary company which develops
> products from patented drug platform technologies which deliver
> drugs more efficiently to the body.  Specifically these drugs are for
> the treatment of Neurological diseases such as Alzheimer/Parkinson
> and Brain Cancer as well as patented slow release drug delivery
> technology for the treatment of type-2 diabetes/arthritis and other
> potential applications.

> Spencer Pharmaceutical offers a wide range of drug delivery
> platforms designed on the impact target markets based on both
> demographics and geographical trends.

Those statements were false and misleading.  In reality, Spencer had no business activities apart

from the single contract to fund research at the UQAM – research supposedly related to a U.S.

patent that, in fact, had been denied by the PTO.

40.     The Disclosure Statement also indicated that Spencer's "head office" and

"administrative and legal offices" were located at 8 Faneuil Hall in Boston.  That statement was

false and misleading.  In reality, the Boston address was merely a "virtual office" that answered

phone calls and forwarded mail. Amyot signed the contract for the "virtual office", made the payments, and directed that all of Spencer's mail should be forwarded to him at Hilbroy.

41.     Beginning in June 2010, the defendants began a coordinated promotional campaign to tout Spencer and its stock that had three components.

a.     Spencer issued press releases about purported developments in its business. Amyot drafted many of the press releases and often sent them to Arella and Morrice with instructions about when to release them. Arella or Morrice were listed as contacts for the company.

b.     IAB Media posted articles about Spencer on its own website called "ItsAllBull.net". Most of the stories commented favorably on the company's recent press releases and encouraged investors to buy Spencer stock soon before the price started rising. The website's fine print disclosed that IAB Media had been compensated with 24,000,000 shares of Spencer stock.

c.     IAB Media, Hilbroy, and the Small Cap Fund, all controlled by Amyot, paid companies operating internet websites devoted to micro-cap stocks to carry reports and other publicity about Spencer, and paid other companies to distribute publicity about Spencer to their lists of email contacts. The companies receiving these payments included AlphaTrade, Blue Wave Advisers, Cream Consulting, Diamond Class Consulting, DMS Consulting, eMarketer, First Alert Financial, Guidance Marketing, International Ventures Capital, Mass Financial Group, MVP Advisors, Nebula Stocks, OTC Picks, Penny Payday, Sherwood Ventures, SmallCapVoice.com, SpeculatingStocks.com, StockRollandRoll, TST Advisors, VNC Associates, and WFWS.

11

42.    The promotional campaign was based upon false and misleading statements about

Spencer's business activities.  On many days when Spencer issued false and misleading public

statements, Amyot sold Spencer stock through the Small Cap fund and through the Cunningham-

Adams Green Fund ("Green Fund"), another investment fund that he controlled.

43.    On June 22, 2010, a public news outlet called *PinkSheets* carried a press release

from Spencer stating that Arella had just been named its president.  Arella was quoted as saying:

> I am delighted to have the opportunity to work with a company that is
> breaking new frontiers with innovative drug release and absorption
> systems for the treatment of metabolic diseases.

Those statements were false and misleading, because Arella had been president of Spencer since

November 2009 and, more importantly, because Spencer did not own any "innovative drug

release and absorption systems for the treatment of metabolic diseases" (although some of the

QAMF researchers it was funding were involved in that area).

44.    On August 24, 2010 at 6:30 a.m., a public news outlet called *MarketWire* carried

a press release from Spencer announcing favorable results for its purported drug delivery

technology.  At 8:03 a.m., IAB Media's website posted a positive comment about Spencer's

news:

> SPPH released some important news this morning and we think it
> could draw some serious investor interest.  It seems they are seeing
> significant traction with their drug delivery technology, so we think
> we could see the trading action in SPPH heat up today as a result.

At 1:16 p.m., IAB Media posted a second positive comment:

> Investors are responding favorably to the news released this morning
> about SPPH's success in taking its drug delivery technology for
> Metform, an important diabetes treatment drug...  Keep a close watch
> on SPPH because as more company developments come in, and more

investors wake up to the story, we could see more sharp moves to the upside!

Those statements were false and misleading, because Spencer had no drug delivery technology. The price of Spencer stock closed that day at $0.25 per share – up 32% from its closing price on the prior trading day. The volume of shares traded soared from 5,000 shares on August 23 to nearly 190,000 shares on August 24.

45.    On August 26, 2010 at 6:30 a.m., *MarketWire* carried a press release from Spencer announcing the "competitive advantages" of its purported drug delivery technology, which "represents a major advancement in oral peptide or protein delivery." At 7:35 a.m., IAB Media's website posted a positive comment about Spencer's news:

> SPPH had another AMAZING day yesterday as we rallied another 20% to close at $0.30. Our readers are now up a whopping 50% from our initial mention of SPPH when it was trading $0.20. Congratulations to all those who jumped in and are now sitting pretty on top of some tidy profits! Volume was light in yesterday's session but we think that will change when investors get wind of today's PR.

Those statements were false and misleading, because Spencer had no drug delivery technology. The price of Spencer stock closed that day at $0.32 per share – up 7% from its closing price on the prior trading day.

46.    On August 30, 2010 at 6:30 a.m., *MarketWire* carried a press release from Spencer announcing that it had added a certain medical researcher to its Scientific Advisory Board. At 7:35 a.m., IAB Media's website posted a positive comment about Spencer's news:

> Since we broke through resistance on SPPH at the $0.25 level, we've been marching slowly, but steadily higher. Closing at $0.35 on Friday, we're now up a very respectable 75% since we alerted our readers to the name, but we think there could still be substantial upside remaining as more and more investors come around the SPPH

13

> story. Today we got another press release from SPPH which tells us
> that there are some serious scientific minds behind the company.

During the day, Amyot's Small Cap Fund sold 107,833 shares of Spencer stock (45% of the day's trading volume) for gross proceeds of $35,529.

47.    On September 1, 2010 at 6:30 a.m., *MarketWire* carried a press release from Spencer announcing that it was expanding its "patent protection to address the growing epidemic in diabetes globally." At 8:05 a.m., IAB Media's website posted a positive comment under the caption "More great news from SPPH this morning." Those statements were false and misleading, because Spencer had no valid patents. During the day, Amyot's Green Fund sold 70,000 shares of Spencer stock (53% of the day's trading volume) for gross proceeds of $22,363.

48.    Spencer continued to issue press releases about its purported business activities during September and October 2010.

49.    On October 25, 2010 at 6:15 a.m., *MarketWire* carried a press release from Spencer announcing that it had expanded its "licensing talks" with companies in the United States, Canada, and Europe. These statements were false and misleading, because Spencer was not engaged in licensing talks with any legitimate companies. During the day, Amyot's Small Cap Fund sold 88,100 shares of Spencer stock (46% of the day's trading volume) for gross proceeds of $24,921.

50.    From June through October 2010, the price of Spencer stock rose from below $0.20 per share to $0.30 per share. As of October 31, 2010, Amyot controlled Spencer stock worth more than $3.2 million through accounts for the Small Cap and Green Funds located at Tillerman Securities in the Bahamas.

14

**The Pump-and-Dump Based on the Purported Buyout Offer**

51.     In early November 2010, the pump-and-dump scheme entered a new and more aggressive phase when Spencer announced that it had received a $245 million buyout offer. Over the next several months, Spencer issued nearly twenty press releases concerning the purported buyout offer. Arella was often quoted in the press releases, and Arella or Morrice were listed as contacts for the company. Amyot drafted many of the press releases and orchestrated the promotional campaign, often giving instructions about when the press releases should be made public, while Arella and Morrice assisted in drafting the releases and in arranging for them to be issued to the public, often through Hilbroy. In addition, IAB Media and Hilbroy continued to pay companies operating internet websites devoted to micro-cap stocks to carry reports and other publicity about Spencer, and continued to pay other companies to distribute publicity about Spencer to their lists of email contacts.

52.     On November 1, 2010, Spencer purportedly received a letter from a Russian investment firm claiming to represent a company that wanted to acquire Spencer. At 10:00 a.m. the next day (November 2), *MarketWire* carried a press release from Spencer announcing that it had received a letter of interest concerning a potential acquisition:

> Spencer Pharmaceutical Inc. announced today that the company has received a letter of interest by a private equity fund for a proposed important investment in the shares of the company.
>
> According to the letter of interest, the private equity fund has requested its identity be kept confidential until further discussion and due diligence is undertaken. However, no price has yet to be discussed nor any formal offer made.
>
> "Although it is very flattering to be courted at this early stage, our objectives are clear and we will continue to work with our partners in licensing our technology for the Met4 as well as our extended release

Ibuprofen," said Dr. Arella, President of Spencer Pharmaceutical Inc.
"Naturally, if a formal offer was to be made by the private equity
fund, the board of directors would consider, evaluate and recommend
a course of action to its shareholders," further added Dr. Arella.

The final terms and conditions of the transaction will be determined in
a definitive agreement. No assurances can be provided that a
definitive agreement will be executed. Execution of a definitive
agreement is subject to, among other things, confirming due diligence
by Spencer and other conditions and approvals by both companies'
management, board of directors and shareholders, as appropriate.

During the day, Amyot's Small Cap Fund sold 57,300 shares of Spencer stock for gross proceeds

of $15,681.

53.     On November 4, 2010 at 11:19 a.m., *MarketWire* carried a press release from

Spencer announcing that it had received an "unsolicited all-cash offer":

Spencer Pharmaceutical Inc. announced today that it has received an
all-cash offer from a private equity firm. According to the company,
a private equity firm has provided the board of directors with an all-
cash offer to acquire any and all shares of the company. The board of
directors has agreed to keep the offer confidential until an investment
bank can be mandated to review the offer, conduct an appropriate due
diligence and recommend a course of action.

"We are surprised to be receiving an all-cash offer at this stage, and in
order to keep our shareholders informed, we have opted to announce
the receipt of the offer yet until we can have an independent review of
the offer we will remain quiet as to his details," said Dr. Arella,
president of Spencer Pharmaceutical Inc. "We don't want to alarm
our shareholders and/or put false hopes that a transaction is imminent
so all we can do at this time is continue with the development of our
licensing program and further development of our technology and
business model to create sustainable shareholder value," further added
Dr. Arella.

The final terms and conditions of the transaction will be determined in
a definitive agreement. No assurances can be provided that a
definitive agreement will be executed. Execution of a definitive
agreement is subject to, among other things, confirming due diligence
by Spencer, and other conditions and approvals by both companies'
management, beard of directors and shareholders, as appropriate.

During the day, Amyot's Small Cap Fund sold 136,290 shares of Spencer stock (45% of the day's trading volume) for gross proceeds of $36,328. The price of Spencer stock closed that day unchanged at $0.29 per share, but the trading volume jumped from 78,000 shares to 302,000 shares.

54.     On November 9, 2010 at 4:01 p.m., *MarketWire* carried a press release from Spencer announcing that it was going to disclose more details about the purported buyout offer by November 12. The price of Spencer stock closed that day at $0.24 per share.

55.     On November 10, 2010 at 3:31 p.m., *MarketWire* carried a press release from Spencer announcing that it had hired a Swiss firm called Strategema Capital to advise it about the purported buyout offer. During the day, Amyot's Small Cap Fund sold 60,000 shares of Spencer stock (32% of the day's trading volume) for gross proceeds of $15,650. The price of Spencer stock closed that day at $0.28 per share – up 17% from its closing price on the prior trading day – and the trading volume more than doubled, from less than 72,000 shares to more than 184,000 shares.

56.     On November 11, 2010 at 9:00 a.m., *MarketWire* carried a press release from Spencer announcing that the purported buyout offer was worth $0.97 per share, or $245 million:

> Spencer Pharmaceutical Inc. announced today that an unsolicited offer received on November 4, 2010 is at a premium of $0.97 per share, making the potential transaction valued at $245 million.
>
> According to the buyout offer documents, the purchaser is requiring any and all shares be tendered for a purchase price of $0.97 per share and with the intent to privatize the company. Spencer Pharmaceutical has opted to continue to keep the purchaser's name confidential until such time as a timeline can be presented and the approval of the board of directors can be obtained.

> "We will conduct our own due diligence of the purchaser but so far
> they have assured us of their seriousness and have marked this
> acquisition as important in terms of strategy but not in terms of
> value," said Dr. Max Arella, President of Spencer Pharmaceutical Inc.
> "We will continue with business as usual but this will also be one of
> our priorities," further added Dr. Arella.

At 9:30 a.m., trading in Spencer stock opened at $0.31 per share – up $0.03 (11%) from its

closing price on the prior trading day. During the day, Amyot's Small Cap and Green Funds

sold a total of 2,316,911 shares of Spencer stock (39% of the day's trading volume) for gross

proceeds of $976,725. The price closed that day at $0.41 per share – up 46% from its closing

price on the prior trading day – on record trading volume of nearly six million shares.

57.     On November 12, 2010 at 8:00 a.m., *MarketWire* carried a press release from

Spencer announcing that its Board of Directors had approved the potential buyout and expected

to announce the name of the purchaser by November 19. Arella was quoted as saying:

> Although we believe the value of the company to be more towards
> $1.58 per share, the offer of $0.97 is acceptable and shareholders will
> be provided the opportunity to vote on the offer as per the normal
> process. We have lots of work to do in making sure that the offer can
> be approved by shareholders as well as regulatory authorities.

At 9:30 a.m., trading in Spencer stock opened at $0.49 per share – up $0.08 (20%) from its

closing price on the prior trading day. During the day, Amyot's Green Fund sold 1,033,220

shares of Spencer stock (39% of the day's volume) for gross proceeds of $501,230. The price

closed that day at $0.60 per share – up 46% from its closing price on the prior trading day – on

trading volume of nearly 2.7 million shares.

58.     In short, between November 10 and 12, 2010, defendants pumped up the price of

Spencer stock from $0.24 per share to $0.60 per share (an increase of 150%) by touting the

purported $245 million buyout offer. At the same time, Amyot's Small Cap and Green Funds

dumped 3,486,421 shares of Spencer stock for total gross proceeds of more than $1.5 million.

59.      On November 15, 2010 at 9:24 a.m., IAB Media's website celebrated the recent

surge in Spencer's stock price:

> It has been a fabulous week for Spencer Pharmaceutical, Inc. It
> rallied on monstrous volume the last 2 trading days closing on Friday
> at $0.60, up 186% from last Monday at $0.21. The reason is Spencer
> received an all cash buyout offer from an undisclosed party at $0.97
> per share. Spencer retained the services of a boutiques financial
> consultancy company in Switzerland to advise on the transaction.
>
> But here is the question on all investors' lips: Who is this Buyer?
>
> As per their last PR on Friday, it will be revealed by November 19th,
> 2010. We suggest that you keep a close eye on Spencer as there is
> still a lot of potential benefits to be made as we expect to see an
> increase in price and volume when the name of the buyer will be
> released.

At 9:35 a.m., *MarketWire* carried a press release from Spencer with additional information about

the purported buyout offer:

> According to ongoing negotiations, the offering party has stipulated
> that the Buyout was for 100% of the shares and that upon an agreed
> timeline that the shares will be required to be tendered by all
> shareholders. They have also stated that they reserved the right to
> acquire shares in the open market prior to the closing of the
> transaction. They have assured that they would place the funds into
> escrow and a mutual timeline was to be established. The objective of
> the offering party is to take the company private as at the close of the
> transaction. The company expects to receive the approval by the
> offering party to release their name and contact information on or
> before November 25, 2010.
>
> "We are moving in the right step to assure a transaction is concluded
> for our shareholders," said Dr. Max Arella, President of Spencer
> Pharmaceutical Inc. "We understand that there is a lot of scientism
> [sic] with the planned transaction because of the confidentiality of the
> buyer and we can only assure our shareholders that we are working
> diligently and in good faith. The offering party is not an American

> company and the cultural differences and language sometimes require
> more attention," further added Dr. Arella.

During the day, Amyot's Small Cap and Green Funds sold a total of 707,271 shares of Spencer

stock (30% of the day's trading volume) for gross proceeds of $407,391.

60.     On November 16, 2010 at 9:05 a.m., *MarketWire* carried a press release from

Spencer that identified the purported buyer as Al-Dora Holdings, a Kuwaiti company:

> Spencer Pharmaceutical Inc. disclosed today that the Al-Dora
> Holdings is the buyout offering entity.[1]
>
> According to information provided to the company, the Al-Dora
> Holdings is a Kuwaiti private investment company owned and
> managed by some of the Gulf's richest families.  The Al-Dora
> Holdings is represented by its chairman, His Excellency Dr. Bandar
> Al-Dhafiri and its CEO His Excellency Hussein Al-Awaid.
>
> "We are happy to now be advanced enough to disclose the name of
> the acquiring party," said Dr. Max Arella, President of Spencer
> Pharmaceutical Inc.  "Even though we are advancing with our
> research and licensing we are putting forth all necessary efforts to see
> this transaction to a successful conclusion," further added Dr. Arella.

During the day, Amyot's Small-Cap Fund sold 172,120 shares of Spencer stock (18% of the

day's trading volume) for gross proceeds of $83,048.

61.     On November 23, 2010 at 9:00 a.m., *MarketWire* carried a press release from

Spencer announcing that Al-Dorra had committed to give it a non-refundable $500,000 deposit:

> Spencer Pharmaceutical Inc. announced today that it has received an
> irrevocable commitment for $500,000 in the Company from Al-
> Dorra. This commitment, the form of which will be determined, will
> be non-refundable.
>
> According to the letter by Al-Dorra, they will forward this
> commitment on or before November 30, 2010.  The non-refundable

---

[1] The available documents use two different spellings ("Al-Dora" and "Al-Dorra") to refer to the purported Kuwaiti company.  In the allegations that follow, the Commission will use whichever spelling appears in the relevant document.

deposit is intended as a sign of good faith and will enable the
company and its independent financial advisors to properly consider
the $0.97 offer proposed by Al-Dorra.  It should be noted that even
though the Company will accept this non-refundable commitment,
Company management is obliged by law to review any third party
offer presented.

"This deposit is yet another great gesture by the Al-Dorra group and
their interest in our technologies is unparalleled and we look forward
to hosting the dinner in their honor," said Dr. Max Arella, President of
Spencer Pharmaceutical Inc.  "The $0.97 offer is not yet established
but each significant step, such as this investment, brings us further to
considering whether such offer is in the best interests of our
shareholders," further added Dr. Arella.

During the day, Amyot's Small Cap Fund sold 735,470 shares of Spencer stock (43% of the

day's trading volume) for gross proceeds of $155,476.

      62.     On November 24, 2010 on 9:48 a.m., *MarketWire* carried a press release from

Spencer announcing that it was cancelling 36 million shares of its common stock, which would

boost the purported buyout offer to $1.10 per share, and that a dinner to honor representatives of

Al-Dorra would be held on November 30:

Spencer Pharmaceutical Inc. announced today that it is in the process
of cancelling 36,000,000 shares, which had been previously issued,
and the said shares will be returned to treasury.

According to the buyout offer of $245 million, the per share price is
now based on 222,431,359 shares outstanding and therefore the
reflected amount will be at $1.10 per share.  The company expects to
sign a definitive agreement with Al-Dorra upon their official visit to
Canada scheduled for November 30, 2010, where the company will
host a dinner in their honor.  It was previously noted that the company
has the legal requirement to review any third party offer, even if Al-
Dorra has irrevocably committed to a $500,000 deposit.

"The reduction in outstanding shares is another way to get a better
price for our shareholders," said Dr. Max Arella, President of Spencer
Pharmaceutical Inc.  "Even if we believe the offer to reflect the value
of our enterprise we will continue to negotiate and look for ways to
increase the value to our shareholders," further added Dr. Arella.

During the day, Amyot's Small Cap Fund sold 121,700 shares of Spencer stock for gross proceeds of $251,436.

63.     On November 30, 2010 at 9:00 a.m., *MarketWire* carried a press release from Spencer announcing that the dinner to honor representatives of Al-Dorra had been postponed until December 8.  During the day, Amyot's Small Cap Fund sold 1,919,636 shares of Spencer stock (46% of the day's trading volume) for gross proceeds of $185,959.

64.     On December 8, 2010 at 10:27 a.m., *MarketWire* carried a press release from Spencer announcing that the dinner to honor representatives of Al-Dorra was going ahead that evening.  During the day, Amyot's Small Cap Fund sold 102,403 shares of Spencer stock for gross proceeds of $23,141.  The price closed that day at $0.20 per share – up 11% from its closing price on the prior trading day.

65.     Spencer received a purported "Conditions to Offer to Purchase Agreement" dated December 8, 2010 in which Al-Dora supposedly stated that it would put $245 million in escrow and that the acquisition was expected to close by March 17, 2011.

66.     On December 10 at 9:00 a.m., *MarketWire* carried a press release from Spencer announcing that it had "formalized" the buyout offer from Al-Dorra, and that the offer would close by March 17, 2011:

> Spencer Pharmaceutical Inc. announced today that it has formalized the buyout offer with the Al-Dorra Group as a successful result of meetings held in Montreal, Canada over the past week.
>
> According to the terms of the format buyout offer, Al-Dorra will acquire Spencer Pharmaceutical for $245 million USD on an all cash transaction to close on or before March 17, 2011.  As per the terms of the formal offer, Al-Dorra reserves the right to acquire shares in the open market and Al-Dorra will deposit $500,000 in the company's

> account to be used to pay legal fees, and expenses associated with the
> ongoing business operations of Spencer Pharmaceutical.
>
> "We are very satisfied with the terms of the buyout offer as it is very
> beneficial to our shareholders," said Dr. Max Arella, President of
> Spencer Pharmaceutical Inc. "I would personally like to thank His
> Excellency Hussein Al-Awaid for his time and travel commitment in
> formalizing the agreement with our board on behalf of our
> shareholders," further added Dr. Arella.

At 9:30 a.m., trading in Spencer stock opened at $0.27 per share – up $0.07 (35%) from its

closing price on the prior trading day.  The price closed that day at $0.29 per share – up 45%

from the prior day's close – on trading volume of more than 3.8 million shares.

      67.     On December 21 at 9:00 a.m., *MarketWire* carried a press release from Spencer

announcing that it had received the $500,000 non-refundable deposit from Al-Dorra:

> Spencer Pharmaceutical Inc. announced today that it has received the
> $500,000 deposit from Al-Dorra as an ongoing process to close the
> $245 million buyout.
>
> According to the company, a third party corporate finance advisory
> firm working with Al-Dorra has provided a non-refundable deposit to
> the company in the amount of $500,000 to be used for ongoing
> business expenses and expenses related to the buyout offer including
> but not limited to legal fees.
>
> "We are pleased that the next anticipated step in the process of the
> buyout offer is completed," said Dr. Max Arella, President of Spencer
> Pharmaceutical Inc. "We intend to continue to update our
> shareholders on the progress of the buyout offer as it is presented to
> us."

During the day, Amyot's Small Cap Fund sold 3,101,242 shares of Spencer stock (75% of the

day's trading volume) for gross proceeds of $445,111.  The next day, the Small Cap Fund sold

1,894,758 shares of Spencer stock (54% of the day's trading volume) for gross proceeds of

$199,164.

68.     On January 20, 2011, a public news outlet called *RediNews* carried a press release

purportedly from Al-Dorra announcing that it was going to spin off a subsidiary called Hail First

Pharma Inc. ("Hail First Pharma"):

> According to the company, Hail First Pharma Inc. is the result of several
> acquisitions and or joint-ventures with international pharmaceutical companies
> including but not limited to Spencer Pharmaceutical Inc., a public traded
> company listed on the US OTC Markets (PINK:SPPH).

Those statements were false and misleading because Hail First Pharma had not acquired or

entered into a joint venture with Spencer. The price of Spencer stock closed that day at $0.21 per

share – up 62% from its closing price on the prior trading day.

69.     On January 26, 2011, Amyot sent an email to Karol Schlosser, ostensibly a

director of an entity in Great Britain called Sterling Stock Investment Ltd. ("Sterling"), with a

draft letter to be sent from Sterling to Spencer. The letter, which was sent to Spencer with the

date of January 31, stated that Sterling was going to guarantee that Al-Dorra had access to $500

million to complete the acquisition of Spencer. Spencer received a second letter from Schlosser

dated February 3, 2011 confirming the purported guarantee.

70.     On January 31, 2011 at 5:30 p.m., *MarketWire* carried a press release from

Spencer announcing that it had received confirmation that Al-Dorra had sufficient funds to

complete the transaction:

> Management of Spencer Pharmaceutical Inc. announced that the
> Company has received from an investment group mandated by His
> Excellency Hussein Al-Awaid (Al-Dorra group) confirmation of their
> intent to prepare availability of funds for the proposed buy-out of
> Spencer. The release of funds is subject to completion of due
> diligence and preparation of final documentation. Specific time-
> frame has not changed as per the original parameters previously

> disclosed in press releases on December 10th, and 14th, 2010
> respectively.

During the next day, Amyot's Small Cap Fund sold 881,574 shares of Spencer stock (54% of the

day's trading volume) for gross proceeds of $116,719.

71.     On February 4, 2011 at 9:00 a.m., *MarketWire* carried a press release from

Spencer announcing that its management had committed to tender its own holdings of Spencer

stock to Al-Dorra:

> Spencer Pharmaceutical Inc. announced that the Company
> management has committed to tender their shares of common stock,
> which holdings equal to an aggregate of 48,750,000 common shares
> and represent approximately 20% of the total issued and outstanding
> shares of the common stock of the Company.

> Management believes that this commitment represents another step in
> the Al-Dorra Holdings buyout process related to the Al-Dorra "Hail
> First Pharma" subsidiary.  It is also important for our shareholders to
> know that the Spencer Pharmaceutical team is working in a dedicated
> and cohesive effort to the successful conclusion of the buyout offer.

During the day, Amyot's Green Fund sold 1,148,500 shares of Spencer stock (63% of the day's

trading volume) for gross proceeds of $115,238.

72.     On February 16, 2011, the chartered accountant in Montreal released audited

2010 financial statements for Spencer.  The balance sheet indicated that Spencer had assets of

$772,197 ($316,269 supposedly related to the patent and $455,928 in cash, which presumably

represented the balance of the $500,000 deposit), liabilities of $1,643,223 ($471,030 of accounts

payable and accruals and $1,172,193 in loans payable), and a shareholders' deficit of nearly

$18 million.  The earnings statement indicated that Spencer had no revenue and a net loss of

$943,196 in 2010.

73.    As noted above, Spencer had announced on December 10, 2010, that the

acquisition by Al-Dorra was expected to close by March 17, 2011.  Several investors called the

company with questions about the anticipated transaction.  Morrice fielded many of the calls and

assured the investors that the transaction would close on time.

74.    On March 15, 2011, Spencer signed a purported "mutual extension agreement"

with Al-Dorra and Hail First Pharma.  The agreement stated:

> Spencer Pharmaceutical Inc. has requested an extension to the
> closing of the buy-out offer to finalize and release the independent
> animal research analysis to shareholders and stakeholders.  Al-Dorra
> and its subsidiary Hail First Pharma has agreed to provide additional
> funding to facilitate the completion of the animal studies and
> ongoing operational expenses in the amount of $1.2 million in (three
> installments of $400,000 each dated March 21, April 21 and May
> 21, 2011).  As an accommodation, Al-Dorra/Hail First Pharma has
> agreed to postpone the closing of the buy-out offer and keep the
> offer open until the end of the 2nd Quarter, 2011.

The agreement was signed by Arella for Spencer and by Amyot as a representative of Al-Dorra

and Hail First Pharma.

75.    On March 16, 2011 at 9:24 a.m., *MarketWire* carried a press release from Spencer

announcing that it had requested an extension of the closing date for the acquisition by Al-Dorra:

> Spencer Pharmaceutical Inc. has requested an extension to the closing
> of the buy-out offer to finalize and release the independent animal
> research analysis to shareholders and stakeholders.

> The Company is pleased to report that Al-Dorra and its subsidiary
> Hail First Pharma have agreed to provide additional funding to
> facilitate the completion of the animal studies and ongoing
> operational expenses in the amount of $1.2 million.  As an
> accommodation, Al-Dorra/Hail First Pharma have agreed to postpone
> the closing of the buy-out offer and keep the offer open until the end
> of the 2nd Quarter, 2011.

In further news, the holders of an additional One-hundred and three million (103,000,000) shares of common stock have agreed to tender their common stock in favor of the Al-Dorra buy-out and its subsidiary Hail First Pharma. This represents, in addition to management's shares already committed, an aggregate of over 55% of the issued and outstanding shares in the Company.

"Spencer Pharmaceutical has an obligation to provide full and fair disclosure in effecting a securities transaction and requires the additional time to fulfill this requirement," stated Dr. Max Arella, President and CEO of Spencer Pharmaceutical Inc. Furthermore, "We would like to thank the continued support of Al Dorra and Hail First Pharm in our mutual efforts to bring this transaction to a successful conclusion!" added Dr. Arella.

At 10:47 a.m., *MarketWire* carried a similar press release purportedly from Hail First Pharma.

76.    There was little news about the purported acquisition after March 16, 2011. In September 2011, Spencer announced that negotiations between the parties had ceased. No acquisition ever took place.

77.    Between November 2, 2010 – when the pump-and-dump scheme began in earnest with news about the purported buyout offer – and April 18, 2011, Amyot's Small Cap and Green Funds sold approximately 36 million shares of Spencer stock for total gross proceeds of more than $5.8 million. During that period, there were more than thirty days when Amyot's trading in Spencer stock accounted for more than 50% of the daily trading volume.

**The Purported Buyout Offer Was Not Real**

78.    Amyot, Arella, and Morrice – and, by extension, the companies they controlled collectively (Spencer) or individually (IAB Media and Hilbroy controlled by Amyot) – knew or were reckless in not knowing that the purported buyout offer was not real.

79.     According to several of its press releases, Spencer conducted due diligence about Al-Dora. However, Arella and Morrice never confirmed that Al-Dora was a legitimate company. They never spoke with anyone at the Russian firm that first approached them about the buyout. They supposedly sent someone to visit Al-Dora's offices in Kuwait, but the individual did not meet with any representatives of Al-Dora, and the office building he identified does not actually contain a business by that name.

80.     Strategema Capital, the Swiss firm hired by Spencer to evaluate the buyout offer, did not speak with anyone at Al-Dora and found nothing in the public domain to confirm the existence of Al-Dora.

81.     Spencer's November 16, 2010 press release identified Al-Dora Holdings as "a Kuwaiti private investment company owned and managed by some of the Gulf's richest families" and identified "His Excellency Dr. Bandar Al-Dhafiri" as its Chairman. Arella and Morrice never met or spoke with Al-Dhafiri, and they obtained no evidence that the name refers to a real person.

82.     Spencer's November 16, 2010 press release also identified "His Excellency Hussein Al-Awaid" as the CEO of Al-Dora Holdings. Al-Awaid is a real person, but he is simply a Kuwaiti-born Canadian citizen who is vice president of a Canadian immigration company. Al-Awaid has had other business dealings with Amyot, who has described him at times as being affiliated with Hilbroy.

83.     The letter dated November 22, 2010 in which Al-Dora supposedly offered to provide the $500,000 non-refundable deposit contains no return address, no letterhead, and no

other contact information, and the signature at the bottom of the letter is illegible and does not contain any typed name.

84.     The letter dated December 8, 2010 and entitled "Conditions to Offer to Purchase Agreement" did not originate with Al-Dora. Rather, an outside attorney hired by Spencer provided Morrice with a blank template that Arella and/or Morrice filled in. The brief document does not contain the level of detail and evidence of due diligence to be expected in a multi-million dollar transaction, and there are multiple spelling and grammatical errors. The document provides only a post office box address for Al-Dora. The document was purportedly signed by Bandar Al-Dhafiri for Al-Dora, but as noted above, Arella and Morrice never met Al-Dhafiri, and they obtained no evidence that the name refers to a real person.

85.     The $500,000 non-refundable deposit that Spencer received on December 21, 2010 did not come from Al-Dora. Rather, Amyot caused Hilbroy to advance the $500,000 to Spencer in exchange for 500,000 shares of Spencer stock.

86.     Spencer received two letters from Sterling purporting to guarantee that Al-Dora had access to $500 million. However, Amyot drafted the letter for his contact Schlosser to sign, and the Sterling firm at the address shown on the letterhead is not an investment firm but rather a chartered accountant business that has no knowledge of the people or information mentioned in the letters.

87.     When Al-Dora's supposed subsidiary, Hail First Pharma, issued press releases, the press releases were sometimes drafted by Amyot, and the company's contact information was sometimes listed as Hilbroy.

88.     Besides the circumstantial evidence set forth above, the purported acquisition of

Spencer makes absolutely no business sense.  On November 12, 2010, Spencer announced that

the buyer was prepared to pay $245 million for the company.  Yet just a week earlier, the

company's interim financial statement indicated that it had assets of $111,532, liabilities of

$303,855, and a shareholders' deficit of more than $17 million.  The interim statement also

indicated that Spencer had no revenue and a net loss of $188,660 in the third quarter of 2010.

Further, an inquiry at the PTO would have revealed that the company's only supposed asset – the

U.S. patent – had been denied by the PTO.  It is inconceivable that a "Kuwaiti private investment

company owned and managed by some of the Gulf's richest families" would have offered to pay

$245 million for a fledgling company with no legitimate assets and no revenue.  Also, the

acquisition was styled as a "tender offer", but none of the necessary paperwork for a real tender

offer was ever filed with the Commission, and public investors were never given instructions

about how to tender their shares.

### FIRST CLAIM FOR RELIEF
### (Violation of Sections 17(a)(1) and (3)
### of the Securities Act by All Defendants)

89.     The Commission repeats and incorporates by reference the allegations in

paragraphs 1-88 above.

90.     Between June 2010 and March 2011, as set forth above, Spencer disseminated

numerous false and misleading press releases, first about supposed progress with its drug

delivery technology and then about a supposed buyout offer from a Mideast company that

wanted to pay $245 million for all of its outstanding shares.  These press releases were false and

misleading because Spencer had no real drug delivery technology and because there was no real

buyout offer.  Amyot wrote many of the press releases, Arella was quoted in almost all of them,

Arella and Morrice worked with Amyot to create and disseminate them, often through Hilbroy, IAB Media repeated many of the false and misleading statements on its own website, and Morrice reassured investors that the statements were true. In addition, while Spencer was issuing the press releases, Amyot, Arella, Morrice, IAB Media, and Hilbroy were conducting a promotional campaign using Internet websites and newsletters to tout Spencer's supposed business activities and the buyout offer.

91.     Defendants, directly and indirectly, acting intentionally, knowingly or recklessly, in the offer or sale of securities by the use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails: have employed or are employing devices, schemes or artifices to defraud; or have engaged or are engaging in transactions, practices or courses of business which operate as a fraud or deceit upon purchasers of the securities.

92.     As a result, defendants have violated and, unless enjoined, will continue to violate Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§77q(a)(1), (3)].

### SECOND CLAIM FOR RELIEF
#### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) by All Defendants)

93.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-91 above.

94.     Between June 2010 and March 2011, as set forth above, Spencer disseminated numerous false and misleading press releases, first about supposed progress with its drug delivery technology and then about a supposed buyout offer from a Mideast company that wanted to pay $245 million for all of its outstanding shares. These press releases were false and

misleading because Spencer had no real drug delivery technology and because there was no real buyout offer. Amyot wrote many of the press releases, Arella was quoted in almost all of them, Arella and Morrice worked with Amyot to create and disseminate them, often through Hilbroy, IAB Media repeated many of the false and misleading statements on its own website, and Morrice reassured investors that the statements were true. In addition, while Spencer was issuing the press releases, Amyot, Arella, Morrice, IAB Media, and Hilbroy were conducting a promotional campaign using Internet websites and newsletters to tout Spencer's supposed business activities and the buyout offer.

95.     Defendants, directly or indirectly, acting intentionally, knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities:  have employed or are employing devices, schemes or artifices to defraud; or have engaged or are engaging in acts, practices or courses of business which operate as a fraud or deceit upon certain persons.

96.     As a result, defendants have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5(a) and (c) [17 C.F.R. §§240.10b-5(a), (c)].

### THIRD CLAIM FOR RELIEF
#### (Violation of Section 17(a)(2) of the Securities Act by Spencer, Amyot, Arella, and Morrice)

97.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-96 above.

98.     Between June 2010 and March 2011, as set forth above, Spencer disseminated numerous false and misleading press releases, first about supposed progress with its drug

32

delivery technology and then about a supposed buyout offer from a Mideast company that wanted to pay $245 million for all of its outstanding shares. These press releases were false and misleading because Spencer had no real drug delivery technology and because there was no real buyout offer. Amyot wrote many of the press releases, Arella was quoted in almost all of them, Arella and Morrice worked with Amyot to create and disseminate them, and Morrice reassured investors that the statements were true.

99.     Defendants Spencer, Amyot, Arella, and Morrice, directly and indirectly, acting intentionally, knowingly or recklessly, in the offer or sale of securities by the use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails: have obtained or are obtaining money or property by means of untrue statements of material fact or omissions to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

100.     As a result, defendants Spencer, Amyot, Arella, and Morrice have violated and, unless enjoined, will continue to violate Section 17(a)(2) of the Securities Act [15 U.S.C. §77q(a)(2)].

### FOURTH CLAIM FOR RELIEF
### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) by Spencer, Amyot, Arella, and Morrice)

101.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-100 above.

102.     Between June 2010 and March 2011, as set forth above, Spencer disseminated numerous false and misleading press releases, first about supposed progress with its drug delivery technology and then about a supposed buyout offer from a Mideast company that

wanted to pay $245 million for all of its outstanding shares. These press releases were false and misleading because Spencer had no real drug delivery technology and because there was no real buyout offer. Amyot wrote many of the press releases, Arella was quoted in almost all of them, Arella and Morrice worked with Amyot to create and disseminate them, and Morrice reassured investors that the statements were true.

103.   Defendants Spencer, Amyot, Arella, and Morrice, directly or indirectly, acting intentionally, knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities: have made or are making untrue statements of material fact or have omitted or are omitting to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

104.   As a result, defendants Spencer, Amyot, Arella, and Morrice have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5(b) [17 C.F.R. §240.10b-5(b)].

## FIFTH CLAIM FOR RELIEF
### (Aiding and Abetting Spencer's Violations of Section 17(a) of the Securities Act by Arella, Morrice, IAB Media, and Hilbroy)

105.   The Commission repeats and incorporates by reference the allegations in paragraphs 1-104 above.

106.   As set forth above, defendant Spencer, directly and indirectly, acting intentionally, knowingly or recklessly, in the offer or sale of securities by the use of the means or instruments of transportation or communication in interstate commerce or by the use of the

34

mails: (a) has employed or is employing devices, schemes or artifices to defraud; (b) has

obtained or is obtaining money or property by means of untrue statements of material fact or

omissions to state a material fact necessary in order to make the statements made, in the light of

the circumstances under which they were made, not misleading; or (c) has engaged or is

engaging in transactions, practices or courses of business which operate as a fraud or deceit upon

purchasers of the securities. As a result, Spencer has violated and, unless enjoined, will continue

to violate Section 17(a) of the Securities Act [15 U.S.C. §77q(a)].

107.    Defendants Arella, Morrice, IAB Media, and Hilbroy each knowingly or

recklessly provided substantial assistance to defendant Spencer's violations of Section 17(a) of

the Securities Act.

108.    As a result, defendants Arella, Morrice, IAB Media, and Hilbroy each aided and

abetted Spencer's violations of Section 17(a) of the Securities Act [15 U.S.C. §77q(a)].

### SIXTH CLAIM FOR RELIEF
(Aiding and Abetting Spencer's Violations of
Section 10(b) of the Exchange Act and Rule 10b-5 by
Arella, Morrice, IAB Media, and Hilbroy)

109.    The Commission repeats and incorporates by reference the allegations in

paragraphs 1-108 above.

110.    As set forth above, defendant Spencer, directly or indirectly, acting intentionally,

knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of

the mails, in connection with the purchase or sale of securities: (a) has employed or is

employing devices, schemes or artifices to defraud; (b) has made or is making untrue statements

of material fact or have omitted or are omitting to state a material fact necessary to make the

statements made, in the light of the circumstances under which they were made, not misleading; or (c) has engaged or is engaging in acts, practices or courses of business which operate as a fraud or deceit upon certain persons.  As a result, defendant Spencer has violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act and Rule 10b-5.

111.    Defendants Arella, Morrice, IAB Media, and Hilbroy each knowingly or recklessly provided substantial assistance to defendant Spencer's violations of Section 10(b) of the Exchange Act and Rule 10b-5(b).

112.    As a result, defendants Arella, Morrice, IAB Media, and Hilbroy each aided and abetted Spencer's violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5.

**SEVENTH CLAIM FOR RELIEF**
**(Amyot's Control Person Liability for Spencer's Violations of**
**Section 10(b) of the Exchange Act and Rule 10b-5)**

113.    The Commission repeats and incorporates by reference the allegations in paragraphs 1-112 above.

114.    As set forth above, defendant Spencer, directly or indirectly, acting intentionally, knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities:  (a) has employed or is employing devices, schemes or artifices to defraud; (b) has made or is making untrue statements of material fact or have omitted or are omitting to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) has engaged or is engaging in acts, practices or courses of business which operate as a

fraud or deceit upon certain persons. As a result, defendant Spencer has violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act and Rule 10b-5.

115. As an officer and director of Spencer until November 2009 and the person who orchestrated the promotional campaign for Spencer and drafted many of its press releases, defendant Amyot exercised control over the public statements and other activities of Spencer that resulted in its violations of Section 10(b) of the Exchange Act and Rule 10b-5.

116. By reason of the foregoing, defendant Amyot is liable as a control person under Section 20(a) of the Exchange Act [15 U.S.C. §78t(a)] for Spencer's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### EIGHTH CLAIM FOR RELIEF
#### (Violation of Sections 5(a) and (c) of the Securities Act by Defendants Spencer, Amyot, and Arella)

117. The Commission repeats and incorporates by reference the allegations in paragraphs 1-116 above.

118. On July 14, 2008, Finkelstein entered into a subscription agreement with Wolverine, which was "to be renamed Spencer Pharmaceutical Inc.," whereby Finkelstein agreed to pay $110,000 for 22 million shares of stock. Amyot controlled both companies at the time of the transaction. There is no evidence that Finkelstein ever paid the $110,000. Arella's signature appears on the document on behalf of Spencer, even though he did not become president of the company until June 2009, suggesting that the agreement may have been back-dated.

119. In November 2009, an attorney issued an opinion letter for Spencer stating that, as of July 14, 2009, the requirements of Rule 144 of the Securities Act had been met regarding Finkelstein's 22 million Spencer shares and so the restrictive legend could be lifted. The

attorney concluded, among other things, that Finkelstein was not an affiliate of Spencer and that the shares had been held for a year based on the July 14, 2008 date of the subscription agreement. The factual predicates for the attorney's opinion were incorrect, as Amyot's control of both Spencer and Finkelstein meant that Finkelstein was an affiliate of Spencer, and the subscription agreement may have been backdated.

120.    On January 12, 2010, Spencer asked its transfer agent to issue 22 million unrestricted shares to Finkelstein. The shares were to be sent to Hilbroy on Finkelstein's behalf.

121.    On or about January 20, 2010, Spencer's transfer agent sent Finkelstein's stock certificate to a Swiss bank. The documentation for the transfer was signed by Amyot.

122.    On March 24, 2010, Finkelstein sold 12 million shares to Tillerman for $25,000. On April 16, 2010, shares were deposited into the account of Amyot's Small Cap Fund.

123.    No registration statement was ever filed for the 22 million shares that Finkelstein received, and no exemption from registration was available.

124.    Spencer, Amyot, and Arella orchestrated the movement of 12 million unrestricted Spencer shares from Spencer through Finkelstein, then through the Swiss bank, and then to Amyot's Small Cap Fund at Tillerman. This share movement evaded the registration requirements of the Securities Act.

125.    Spencer, Amyot, and Arella, directly or indirectly: (a) have made or are making use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) have made or are making use of the means or instruments of

38

transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been filed and for which no exemption from registration has been available.

126.    As a result, Spencer, Amyot, and Arella have violated and, unless enjoined, will continue to violate Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§77e(a), (c)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A.    Enter a permanent injunction restraining the defendants, and each of their agents, servants, employees, and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of:

      1.    Sections 17(a) of the Securities Act [15 U.S.C. §77q(a)]; and

      2.    Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5
         thereunder [17 C.F.R. §240.10b-5];

B.    Enter a permanent injunction restraining defendants Spencer, Amyot, and Arella, and each of their agents, servants, employees, and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§77e(a), (c)];

C.     Require the defendants to disgorge their ill-gotten gains, plus pre-judgment interest;

D.     Order the defendants to pay appropriate civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)];

E.     Enter an order, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. §78u(d)(2)], barring Amyot, Arella, and Morrice from serving as an officer or director of any issuer required to file reports with the Commission pursuant to Sections 12(b), 12(g) or 15(d) of the Exchange Act [15 U.S.C. §§78l(b), 78l(g), 78o(d)];

F.     Enter an order, pursuant to Section 20(g) of the Securities Act [15 U.S.C. §77t(g)] and Section 21(d)(6)(B) of the Exchange Act [15 U.S.C. §78u(d)(6)(B)], barring Amyot, Arella, and Morrice from participating in an offering of a penny stock, as defined in Section 3(a)(51) of the Exchange Act [15 U.S.C. §78c(a)(51)];

G.     Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

H.     Award such other and further relief as the Court deems just and proper.

Respectfully submitted,

Martin F. Healey  (Mass. Bar No. 227550)
    Regional Trial Counsel
Frank C. Huntington  (Mass. Bar No. 544045)
    Senior Trial Counsel
Amy Gwiazda  (Mass. Bar No. 663494)
    Senior Enforcement Counsel
James R. Drabick  (Mass. Bar No. 667460)
    Enforcement Counsel

40

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
33 Arch Street, 23rd Floor
Boston, MA 02110
(617) 573-8960  (Huntington direct)
(617) 573-4590  (fax)
huntingtonf@sec.gov  (Huntington email)

Dated:  December 17, 2012

41