UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 12-12334-IT |
| | * | |
| SPENCER PHARMACEUTICAL INC. et al., | * | |
| | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM AND ORDER ON DEFENDANT AMYOT'S MOTION TO DISMISS FOR
LACK OF JURISDICTION

November 14, 2014

TALWANI, D.J.

I.     Introduction

        This case involves allegations that Defendant Jean-Francois Amyot ("Amyot"), a

Canadian national, violated U.S. securities law.  On May 15, 2013, Amyot filed a Motion to

Dismiss the Complaint for Lack of Jurisdiction [#18], alleging that the federal court in

Massachusetts lacked personal jurisdiction over him to adjudicate the case.  After full briefing,

the court denied the motion without prejudice to reconsideration.  See Electronic Clerk's Notes

[#47].  On October 22, 2014, the court notified the parties that it would review the jurisdictional

question prior to the commencement of trial, which is scheduled for November 17, 2014.  In

addition to considering the original papers filed in support of or in opposition to the motion, the

court allowed the parties to file supplemental materials in support of their respective arguments.

See Electronic Clerk's Notes [#138].  Amyot informed the court on October 22, 2014, that he

would not file a supplement, but would rest on his original papers.  Plaintiff SEC filed

supplemental materials on October 27, 2014.  <u>See</u> Supplement Pl.'s Opp'n Def.'s Mot. Dismiss

Lack Personal Jurisdiction [#135] [hereinafter Pl.'s Supplement].

II.   <u>Allegations and Proffered Evidence Relating to Jurisdiction</u>

Plaintiff SEC alleges that Amyot engaged in a scheme to artificially inflate the stock

price of Defendant Spencer Pharmaceutical, Inc. ("Spencer") before "dumping" the stock into

the market for a gross gain of approximately $5.8 million dollars.  Compl. ¶¶ 1-3.  Plaintiff SEC

brings claims against Amyot for violations of the Securities Act of 1933 and the Exchange Act of

1934.  <u>See</u> <u>id.</u> ¶ 4.

*A.    Amyot's Involvement with Spencer*

In February 2008, Amyot incorporated Wolverine Oil and Gas Corp. in Nevada and

named himself director.  <u>See</u> <u>id.</u> ¶ 17; Def.'s Answer ¶ 17 [#48].  On May 27, 2009, Amyot filed

an amendment renaming Wolverine Oil and Gas Corp. as Spencer.  <u>See</u> Compl. ¶ 18; Def.'s

Answer ¶ 18.  In July 2009, Spencer entered into a reverse merger with a Delaware Corporation,

Emergensys, which then adopted the name Spencer.  <u>See</u> Compl. ¶ 19; Def.'s Answer ¶ 19.

Amyot had previously served as president of Emergensys, and he became a vice president of the

newly formed Spencer.  <u>See</u> Compl. ¶¶ 16, 21; Def.'s Answer ¶¶ 16, 21.

The complaint alleges that in August 2009 Amyot created the appearance that Spencer

was headquartered in Boston, Massachusetts by setting up a "virtual office."  <u>See</u> Compl. ¶¶ 7,

10, 40; <u>see also</u> Pl.'s Substituted Combined Opp'n Mots. Dismiss Filed Defs. Jean-Francois

Amyot, IAB Media Inc., & Hilbroy Advisory Inc., Ex. 1 [#34] [hereinafter Pl.'s Opp'n].  Amyot

entered into a contract for the creation of this office and coordinated the payment of fees for its

setup.  <u>See</u> Pl.'s Supplement at Ex. 3.  Spencer had no physical presence in Massachusetts, and

all mail received at its Boston address was forwarded to Defendant Hilbroy Advisory, Inc

("Hilbroy"), a public relations firm allegedly controlled by Amyot.  See Pl.'s Opp'n at Ex. 1;

Compl. ¶¶ 15, 40-41.  In November 2009, Amyot officially resigned from his position as vice

president of Spencer; he was replaced by Defendants Ian Morrice and Max Arella.  See Compl.

¶¶ 21-22; Def.'s Answer ¶¶ 21-22.  Even after Amyot resigned, Plaintiff SEC alleges that he

maintained control of Spencer's operations and provided all of Spencer's funding.  See Compl. ¶

23; Pl.'s Opp'n at Ex. 5 (deposition testimony of Defendant Max Arella that all of Spencer's

funding came from Amyot); Pl.'s Supplement at Ex. 7 (letter dated November 12, 2010, and

signed by Amyot as vice president of Spencer).

> B.        *The Spencer Press Releases*

From August 2010 through April 2011, Spencer issued a number of press releases that

were published nationwide by a news outlet called MarketWire.[1]  See id. ¶¶ 44-76; Pl.'s

Supplement at Ex. 8.  These press releases were drafted by Hilbroy and sent for release by

Amyot.  Pl.'s Supplement at Ex. 8; Compl. ¶ 41.

The complaint alleges that each of these press releases included false and misleading

information about Spencer's operations and assets.  See Compl. ¶¶ 44-76.  The press releases

were labeled as originating from "Boston, MA" and indicated that Spencer was a "US-based"

pharmaceutical company.  See Pl.'s Opp'n at Ex. 4; Pl.'s Supplement at Ex. 8.  Beginning in

November 2010, the subject of these press releases was an alleged $245 million buyout of

Spencer by a foreign company, identified as Kuwaiti-based Al-Dora Holdings.  See Compl. ¶¶

51-76.  No buyout ever occurred, and a press release issued in October 2011 stated that

negotiations had ceased.  See id. at ¶ 76.  The complaint alleges that all information regarding

---

[1] Plaintiff SEC presented an invoice addressed to Spencer and Amyot from MacReport.Net
Media Publishing Inc., a company in New York, for its service providing nationwide distribution
via MarketWire.  See Pl.'s Supplement at Ex. 8.

this buyout was falsified in order to deceive market participants about the value of Spencer's stock.  See id.  According to the complaint, the press releases succeeded in artificially inflating the stock price of Spencer, and Amyot eventually gained more than $5.8 million dollars through the sale of this fraudulently inflated stock.  See id. ¶ 58.

       C.     *Sale of Unregistered Securities*

The complaint further alleges that Amyot facilitated the transfer of 12 million shares of unregistered Spencer stock, in violation of the registration requirements of Section 5 of the Securities Act.  See id. ¶¶ 36, 123.  According to the SEC, Amyot hired a Colorado-based attorney to provide an opinion letter stating that these shares were eligible for an exemption from SEC registration requirements.  See id. ¶¶ 119-20; Pl.'s Supplement at Ex. 12.  The opinion letter stated that Finkelstein Capital, Inc. ("Finkelstein"), the Canadian corporation that was to receive the shares, was not an affiliate of Spencer and that all other eligibility requirements for a registration exemption had been met.  See Compl. ¶¶ 36, 118-19.  On the basis of this exemption, the letter stated that any restriction on the shares' free transfer should be removed.  See Pl.'s Supplement at Ex. 12.  Plaintiff SEC alleges that the shares were not eligible for such an exemption because Finkelstein and Spencer were both controlled by Amyot, such that the businesses were affiliated by means of common ownership.  See Compl. ¶ 119.

The opinion letter, which was dated November 30, 2009, was sent to Spencer's registered transfer agent—Utah-based Interwest Transfer Co., Inc. ("Interwest").  See Pl.'s Opp'n at Ex. 2 (listing Interwest as Spencer's transfer agent); Pl.'s Supplement at Ex. 12 (addressing letter to Interwest).  On January 20, 2010, Interwest allegedly sent Finkelstein's stock certificate for the 12 million shares to a Swiss bank account.  See Compl. ¶ 121.  According to the SEC, the documentation for this share transfer was signed by Amyot.  See id.

II.    Discussion

    A.    *Jurisdictional Principles*

The plaintiff has the burden of showing that the court has personal jurisdiction over a defendant.  See, e.g., Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 50 (1st Cir. 2002).  In considering a motion to dismiss for lack of personal jurisdiction, the court may employ one of three approaches: (1) assessing whether "the plaintiff has proffered evidence that, if credited, is enough to support findings of all facts essential to personal jurisdiction"; (2) holding a pretrial evidentiary hearing to determine whether jurisdiction is appropriate to a preponderance-of-the-evidence standard; or (3) holding a pretrial evidentiary hearing, but determining only that the plaintiff has shown "a likelihood of the existence of each [necessary] fact."  See Boit v. Gar-Tec Products, Inc., 967 F.2d 671, 675-78 (1st Cir. 1992).

Where, as here, the court determines personal jurisdiction without first holding an evidentiary hearing, the first approach, commonly called the "prima facie standard," governs the court's determination.  See United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 618 (1st Cir. 2001); see also Dean v. Motel 6 Operating L.P., 134 F.3d 1269, 1272 (6th Cir. 1998) (holding that the prima facie standard applies in the absence of an evidentiary hearing despite the fact discovery had already occurred).  To satisfy the prima facie standard, "the 'plaintiff must go beyond the pleadings'" and make a "showing of personal jurisdiction . . . based on evidence of specific facts set forth in the record."  Boit, 967 F.2d at 675.  In assessing whether this burden is met, the court "is not acting as a factfinder; rather, it accepts properly supported proffers of evidence by a plaintiff as true and makes its ruling as a matter of law."  Swiss Am. Bank, 274 F.3d at 619 (citation and internal quotation marks omitted).

B.      *Nationwide Forum in Securities Actions*

"When a district court's subject matter jurisdiction is founded upon a federal question, the constitutional limits of the court's personal jurisdiction are fixed, in the first instance, not by the Fourteenth Amendment but by the Due Process Clause of the Fifth Amendment."  United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant Street Corp., 960 F.2d 1080, 1085 (1st Cir. 1992).  In such cases, "the Constitution requires only that the defendant have the requisite 'minimum contacts' with the United States, rather than with the particular forum state."  Id. Because the court's personal jurisdiction over a defendant is "inextricably intertwined" with the court's ability to serve process on that defendant, in order to establish personal jurisdiction over a foreign defendant on the basis of that defendant's minimum contacts with the United States, the plaintiff's claims must also arise from a statute that provides for worldwide service.  Id.

The Securities Act and the Exchange Act include identical language providing in pertinent part that "process . . . may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found.  15 U.S.C. § 77v(a) (emphasis added); id. § 78aa(a) (emphasis added).  Because these statutes provide for worldwide service of process, Plaintiff SEC must establish that Amyot had minimum contacts with the United States sufficient to sustain personal jurisdiction.  See, e.g., Warfield v. Alaniz, 569 F.3d 1015, 1029 (9th Cir. 2009) (holding that the United States, not a particular state therein, was the appropriate forum for consideration of minimum contacts related to claims alleging violations of the Exchange and Securities Acts); U.S. S.E.C. v. Carrillo, 115 F.3d 1540, 1543 (11th Cir. 1997) (same); In re Application to Enforce Admin. of Subpoenas of S.E.C. v. Knowles, 87 F.3d 413, 417 (10th Cir. 1996) (same); Busch v. Buchman, Buchman & O'Brien, 11 F.3d 1255, 1258 (5th Cir. 1994) (same); Amtrol, Inc. v. Vent-Rite Valve Corp., 646 F.Supp. 1168, 1172 (D. Mass. 1986)

(holding, based on the worldwide service provisions of the Clayton Act, that the defendant in an antitrust case was "correct in asserting that the extraterritorial service in this case must be tested against the familiar 'minimum contacts' analysis. However, the relevant forum is not Massachusetts, but rather the entire United States.")

    C.    *Specific Jurisdiction*

An exercise of personal jurisdiction must comply with both statutory limitations and the due process requirements of the U.S. Constitution. See, e.g., Boit, 967 F.2d at 675 (quoting U.S.S. Yachts, Inc. v. Ocean Yachts, Inc., 894 F.2d 9, 11 (1st Cir. 1990)). "A district court may exercise authority over a defendant by virtue of either general or specific jurisdiction." Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 34 (1st Cir. 1998). Specific jurisdiction requires "a demonstrable nexus between a plaintiff's claims and a defendant's forum-based activities." Id. General jurisdiction, in contrast, "exists when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state." Swiss Am. Bank, 274 F.3d at 618 (citation and internal quotation marks omitted). Plaintiff SEC argues for the court's specific jurisdiction over Amyot.

In the context of specific jurisdiction, the Constitution requires that a defendant have maintained "minimum contacts" with the forum, "such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). Whether minimum contacts exist is assessed through a tripartite test. First, "the litigation [must] result[] from alleged injuries that 'arise out of or relate to'" the defendant's in-forum activities. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985) (citations omitted). Second, there must be "'some act by which the defendant purposefully avails

itself of the privilege of conducting activities within the forum . . . thus invoking the benefits and protections of its laws.'" Id. at 2183 (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958). Third, the defendant's conduct and activities much be such that it is "'reasonable . . . to require the [defendant] to defend'" a suit in the chosen forum. World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292 (1980) (quoting Int'l Shoe, 326 U.S. at 317).

> D.   *Personal Jurisdiction over Amyot*

> 1.   *Relatedness*

"The evidence produced to support specific jurisdiction must show that the cause of action either arises directly out of, or is related to, the defendant's forum-based contacts." Harlow v. Children's Hosp., 432 F.3d at 50, 60-61 (1st Cir. 2005). In Harlow, the First Circuit explained that relatedness "requires a showing of a material connection," and that "the defendant's in-[forum] conduct must form an 'important, or [at least] material, element of proof' in the plaintiff's case." Id. at 61 (quoting Marino v. Hyatt Corp., 793 F.2d 427, 430 (1st Cir.1986)). Because "[q]uestions of specific jurisdiction are always tied to the particular claims asserted," the court must evaluate whether sufficient contacts exist for each cause of action. Phillips Exeter Acad. v. Howard Phillips Fund, 196 F.3d 284, 289 (1st Cir. 1999).

> a.   *Counts One, Two, Three, and Four*[2]

Counts One through Four of Plaintiff SEC's complaint allege violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j; Rule 10-b(5), 17 C.F.R. 240.10b-5; and Section 17(a) of the Securities Act, 15 U.S.C. § 77q. Central to each of these claims is Amyot's purported distribution of fraudulent information regarding the nature of Spencer's business operations and

---

[2] Plaintiff SEC voluntarily dismissed Count Seven of the complaint on November 7, 2014. See Stipulation Dismissal [#156]. Counts Five and Six were alleged only against other defendants. See Compl. ¶¶ 108, 112. Count Eight is discussed separately, below.

the proposed buyout by Al-Dora Holdings.  See, e.g., S.E.C. v. First Jersey Sec., Inc., 101 F.3d

1450, 1467 (2d Cir. 1996) (explaining that the material elements of claims under Section 10(b)

and Section 17(a) are "essentially the same").

Plaintiff SEC highlights that Amyot set up Spencer's "virtual office" in Boston and that

Amyot helped to draft and facilitated the nationwide publication of Spencer's press releases,

each of which contained false and misleading information regarding Spencer's alleged buyout

and Spencer's purported status as a "US-based company."  These acts directly relate to the

purported scheme to disseminate false information regarding Spencer, its operations, and the

value of its stock to the U.S. securities market.

Amyot argues that Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. 247 (2010), precludes

jurisdiction in this case because it limits the application of U.S. securities law to securities

"registered on domestic exchanges" and "domestic transactions" of other securities.  Id. at 267.

Amyot argues that Spencer's stock was traded on OTC-Links, which is not an "exchange" as the

term is used in Morrison.  See Def.'s Reply Mem. Law Further Supp. Mot. Dismiss Complaint

Based Lack Personal Jurisdiction, 4 [#44] [hereinafter Def.'s Reply].  Similarly, Amyot argues

that under Janus Capital Grp., Inc. v. First Derivative Traders, 131 S. Ct. 2296 (2011), he cannot

be liable for the content of press releases issued in Spencer's name, because "one who prepares

or publishes a statement on behalf of another is not its maker."  Id. at 2303.

Amyot's reliance on Morrison and Janus Capital is misplaced as it relates to the question

of personal jurisdiction.  In Morrison, the Supreme Court considered whether the extraterritorial

reach of U.S. securities law was a question of subject matter jurisdiction.  Morrison, 561 U.S. at

253-54.  The Court held that it was not, ruling that the extraterritorial application of law was

related to "whether the allegations the plaintiff makes entitles [it] to relief," not whether the court

had "'power to hear'" the case.  Id. at 254.  Like subject matter jurisdiction, personal jurisdiction

is a distinct inquiry from the merits of a case.  Similarly, Janus Capital involves a question of

whether a defendant can ultimately be held liable for the content of press releases, but does not

implicate the question of whether the court may assert personal jurisdiction over a defendant that

drafted and facilitated distribution of those releases.

*b.    Count Eight*

Count Eight alleges a violation of Section 5(a) and 5(c) of the Securities Act through the

sale of unregistered securities.  See 15 U.S.C. § 77e(a), (c).  In support of the court's personal

jurisdiction over Amyot, Plaintiff SEC presented evidence of Amyot's role in procuring an

opinion letter stating that certain shares of Spencer's stock were exempt from SEC registration

requirements.  See 17 C.F.R. § 230.144 (defining the requirements for an exemption from

registration requirements).  This evidence includes an invoice for $1,350 addressed to Hilbroy

from the Colorado-based attorney who prepared the opinion letter as well as a wire transfer for

the amount owed signed by Amyot.  See Pl.'s Supplement at Ex. 12.

The opinion letter is addressed to Spencer's Utah-based transfer agent, Interwest, and it

informs the transfer agent that any restrictions on the free transfer of the 12 million shares should

be removed.  See id.  To remove the restrictive legend barring free transfer of unregistered stock,

a transfer agent must receive consent of the stock's issuer, usually through an opinion letter sent

by the issuer's counsel.  Removal of this restrictive legend is the "first step in, and a necessary

incident to[,] the contemplated transfer of such stock."  Kenler v. Canal Nat'l Bank, 488 F.2d

482, 485 (1st Cir. 1973).  Accordingly, Amyot's role in procuring the opinion letter stating that

these shares were exempt from registration requirements facilitated Interwest's removal of the

share's restrictive legend and directly related to the alleged improper transfer of these shares in violation of Section 5 of the Securities Act.

<strong>2.     <em>Purposeful Availment</em></strong>

Purposeful availment is "satisfied when the defendant purposefully and voluntarily directs his activities toward the forum so that he should expect, by virtue of the benefit he receives, to be subject to the court's jurisdiction based on these contacts." <u>Swiss Am. Bank</u>, 274 F.3d at 623-24.  "Accordingly, the 'two cornerstones of purposeful availment' are foreseeablility and voluntariness." <u>C.W. Downer & Co. v. Bioriginal Food & Sci. Corp</u>, No. 13-11788-DJC, 2014 WL 815189, at *4 (D. Mass. Mar. 3, 2014) (quoting <u>Ticketmaster-N.Y., Inc. v. Alioto</u>, 26 F.3d 201, 207 (1st Cir. 1994)).

<strong>a.     <em>Counts One, Two, Three, and Four</em></strong>

Plaintiff SEC's claims under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j; Rule 10-b(5), 17 C.F.R. § 240.10b-5; and Section 17(a) of the Securities, 15 U.S.C. § 77q, relate to allegations of fraudulent conduct concerning the issuance of press releases intended to falsely inflate the price of Spencer's stock.  Plaintiff SEC argues that through the creation of a virtual office, and the subsequent press releases identifying Spencer as a U.S.-based company, Amyot directed his actions at the United States in a manner sufficient to establish purposeful availment. Amyot alleges that merely entering into a contract creating this virtual office is insufficient to establish that he purposefully availed himself of the United States.  Def.'s Mem. at 9-10.

In <u>Burger King Corp.</u>, 471 U.S. 462, the Supreme Court recognized that:

> Jurisdiction . . .  may not be avoided merely because the defendant did not *physically* enter the forum State. . . .  [I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a

11

> commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.

Id. at 476 (citations omitted).  The First Circuit has similarly held that, in the absence of a defendant's physical presence in a forum, the court may look "for some other indication that the defendant reached into the forum, such as mail or telephone contacts."  Swiss Am. Bank, 274 F.3d at 622.

The instant case is distinguishable from cases in which a defendant's digital presence within a forum is insufficient to prove that the defendant availed himself of that forum.  See, e.g., DCM Sys., Inc. v. Tech. Trades Inst., Inc., No. 14-cv-10243-IT, 2014 WL 4804743 (D. Mass. Sept. 25, 2014) (finding that the online viewing of a video by Massachusetts residents, in the absence of any evidence that the video's distributor targeted those residents, was insufficient to show purposeful availment); cf. N. Light Tech. v. N. Lights Club, 97 F. Supp. 2d 96, 106 (D. Mass. 2000) (requiring more than the "mere existence of a web site . . . to show purposeful availment").   Here, Amyot set up a "virtual office" in Massachusetts and facilitated the drafting and issuance of press releases identifying Spencer as a Boston-based U.S. pharmaceutical company.  See Pl.'s Opp'n at Ex. 5 (providing a copy of deposition testimony of Defendant Max Arella stating that Spencer's location was chosen because "most of the biotech in . . . [that] part of the United States and Canada is done in [the] Boston area").  These facts suffice to show that Amyot intended to create the impression that Spencer was based in Boston, Massachusetts and operated as a U.S. company, and thus that he purposefully targeted a U.S. forum.

                    b.      Count Eight

Plaintiff SEC has provided specific evidence showing that Amyot engaged a Colorado-based attorney to provide an opinion letter to Spencer's Utah-based transfer agent.  See Pl.'s

Supplement at Ex. 12; Pl.'s Opp'n at Ex. 2.  This letter allegedly facilitated the unlawful issuance

of shares of Spencer common stock by precipitating the removal of the share's restrictive legend

despite the fact that the shares did not properly meet the standard for an exemption from SEC

registration requirements.  See Pl.'s Supplement at Ex. 12 (stating the opinion that the restrictive

legend should be removed).  The acts of hiring an attorney to draft this letter and directing the

letter to Interwest exhibit an intentional engagement with the United States and focus on the U.S.

securities market sufficient to satisfy the requirements of purposeful availment for this claim.

        *3.*    *Reasonableness*

A court's determination of the reasonableness of suit in a particular forum looks to "five

gestalt factors: (1) the defendant's burden in appearing in the court; (2) the forum state's interest

in hearing the suit; (3) the plaintiff's convenience and interest in effective relief; (4) the judicial

system's interest in obtaining the most effective resolution of the controversy; and (5) the

common interests of all interested states in promoting substantive social policies."  Hasbro, Inc.

v. Clue Computing, Inc., 994 F. Supp. 34, 45 (D. Mass. 1997) (citing Burger King Corp., 471

U.S. at 477).  Because these gestalt factors affect all of Plaintiff SEC's jurisdictional claims in

the same manner, the court treats Counts One through Four as well as Count Eight together.

As to the first gestalt factor, the First Circuit has made clear that, because "staging a

defense in a foreign jurisdiction is almost always inconvenient and/or costly, . . . this factor is

only meaningful where a party can demonstrate some kind of special or unusual burden."

Pritzker v. Yari, 42 F.3d 53, 64 (1st Cir. 1994).  Amyot has alleged no such special burden here.

Moreover, the second gestalt factor favors jurisdiction because the United States certainly has an

interest in the adjudication of its own securities laws.  Similarly, as to the third gestalt factor, "a

plaintiff's choice of forum must be accorded a degree of deference with respect to the issue of its

own convenience."  Sawtelle v. Farrell, 70 F.3d 1381, 1395 (1st Cir. 1995).

      The fourth and fifth gestalt factors relate to the effective resolution of this dispute and the

relative interests of Canada and the United States in "promoting substantive social policies."  See

Hasbro, 994 F. Supp. at 45.  The court recognizes that Canada has a strong interest in the

enforcement of its laws and the adjudication of disputes regarding its citizens, but finds that this

interest does not outweigh the United States' interest in resolving cases related to a violation of

U.S. securities law and giving rise to injury within this forum's borders.  Accordingly, on the

whole, the gestalt factors favor a finding that jurisdiction over Amyot is reasonable for all

claims.

*4.    Venue in Massachusetts*

      Under the Exchange Act, venue may be laid in "the district wherein any act or transaction

constituting the violation occurred."  15 U.S.C. § 78aa.  Such an act "'need not constitute the

core of the alleged violation'" and need not be illegal, so long as it "'represents more than an

immaterial part of the alleged violations.'"  S-G Sec., Inc. v. Fuqua Inv. Co., 466 F. Supp. 1114,

1121 (D. Mass. 1978) (quoting Sohns v. Dahl, 392 F. Supp. 1208, 1215 (W.D. Va. 1975)).

      Here, Plaintiff SEC alleges that Amyot issued press releases containing false information

intending to deceive investors into believing that Spencer was a pharmaceutical company based

in Boston, Massachusetts.  Amyot signed a contract to open a "virtual office" in Boston, and had

all mail and communications to that office forwarded to Hilbroy.  This act is sufficient to prove

that venue is proper in Massachusetts.  See, e.g., Hooper v. Mountain Sts. Sec. Corp., 282 F.2d

195, 204-05 (5th Cir. 1960) ("[A]ny use of instrumentalities of the mails or other interstate facilities made within the forum district constituting an important step in the execution of the fraudulent, deceitful scheme or in its consummation is sufficient' for venue to lie in that district."); S-G Sec., 466 F. Supp. at 1121-22 (holding that the dissemination of press releases within a district was sufficient to establish venue therein).

Where claims are alleged under both the Exchange Act and the Securities Act, satisfaction of the broader venue provision of the Exchange Act is sufficient to make venue appropriate for actions arising from the Securities Act as well. See, e.g., Liles v. Ginn-La W. End, Ltd., 631 F.3d 1242, 1253-54 (11th Cir. 2011) ("Where a plaintiff states claims under both the '33 and '34 Acts, the less restrictive jurisdiction and venue provisions contained in the 1934 Act govern." (internal quotation marks omitted) (citing Hilgeman v. Nat'l Ins. Co. of Am., 547 F.2d 298, 302 n.7 (5th Cir. 1977); S.E.C. v. AutoChina Int'l Ltd., No. 12-10643-GAO, 2013 WL 265974, at *1 (D. Mass. Jan. 24, 2013) ("The complaint asserts that venue is established both under the Securities Act and the Exchange Act. It is only necessary to address the latter because it is broader of the two." (citations omitted));14D Wright & Miller 4th ed. § 3842 ("If claims are pressed under more than one of the securities statutes, and venue is satisfied for one of those statutes, venue will be considered proper for the claims under the other statutes."). Accordingly, Plaintiff SEC's satisfaction of the venue provision of the Exchange Act is sufficient to establish that Massachusetts is an appropriate venue for the claims brought in this suit.

IV.     Conclusion

For the foregoing reasons, the court finds that Plaintiff SEC has satisfied its prima facie

burden of proving personal jurisdiction over Amyot.[3]  Amyot's <u>Motion to Dismiss the Complaint</u>

<u>for Lack of Jurisdiction</u> [#18] is hereby DENIED.

IT IS SO ORDERED.

November 14, 2014                                                    /s/ Indira Talwani
                                                                United States District Judge

---

[3] Plaintiff SEC retains the burden of proving the jurisdictional facts to a preponderance of the evidence at trial.  <u>Boit</u>, 967 F.2d at 678 (determining jurisdiction under the prima facie standard is "an implicit deferral until trial of the final ruling on jurisdiction").