UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 12-cv-12334-IT |
| | * | |
| SPENCER PHARMACEUTICAL INC., et al., | * | |
| | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM AND ORDER ON DEFAULT JUDGMENT

September 30, 2015

TALWANI, D.J.

I.     Introduction

The Securities and Exchange Commission ("SEC") brought this civil enforcement action against three individuals and three corporations. The court entered default against the three corporate Defendants, Spencer Pharmaceuticals, Inc. ("Spencer"); IAB Media, Inc. ("IAB"); and Hilbroy Advisory, Inc. ("Hilbroy"), when they did not appear through counsel. Two individual Defendants entered into consent judgments with the SEC, which were approved by the court. The remaining Defendant, Jean Francois Amyot ("Amyot"), defended this action *pro se* until the eve of trial. When the court convened for trial on the morning of November 17, 2014, Amyot was absent. The court entered a notice of default against Amyot in open court for failure to appear at trial.

Now before the court is the SEC's <u>Combined Motion for Default Judgments, Remedies, and Sanctions</u> [#181] against Amyot, Spencer, IAB, and Hilbroy.[1]  As set forth below, the motion is ALLOWED.

II.     <u>Personal Jurisdiction</u>

On May 15, 2013, Amyot filed a <u>Motion to Dismiss the Complaint for Lack of Jurisdiction</u> [#18].  This motion was initially denied without prejudice to reconsideration.  <u>See</u> Electronic Clerk's Notes [#47].  After the case was reassigned, the court ruled that personal jurisdiction had been established under the *prima facie* standard.  <u>See</u> Mem. & Order Def. Amyot's Mot. Dismiss Lack Jurisdiction [#162].

Under the *prima facie* standard, the court took all properly supported facts in the light most favorable to the SEC.  By way of Amyot's default, each of those facts has now been deemed admitted, <u>see</u> <u>KPS & Assocs. v. Designs By FMC, Inc.</u>, 318 F.3d 1, 24 (1st Cir. 2003); <u>Franco</u>, 184 F.3d 4, 9 n.3 (1st Cir. 1999).  As a result, the factual basis for the court's prior personal jurisdiction ruling remains unchanged.  Accordingly, on the facts set forth and for the reasons provided in the <u>Memorandum and Order on Defendant Amyot's Motion to Dismiss for Lack of Personal Jurisdiction</u> [#162], the court finds that the SEC has established the court's personal jurisdiction over Amyot to a preponderance of the evidence.

IV.     <u>Liability</u>

Although Defendants' default resolves any dispute as to the well-pleaded facts in complaint, <u>see</u> <u>KPS & Assocs.</u>, 318 F.3d at 24; <u>Franco</u>, 184 F.3d at 9 n.3, the entry of default does not foreclose legal challenges as to whether those facts, taken as true, state a legal claim.

---

[1] This motion supplants the SEC's earlier <u>Motion for Default Judgments</u> [#120] against only the three corporate Defendants.  That motion, accordingly, is DENIED AS MOOT.

See Remexcel Managerial Consultants, Inc. v. Arlequin, 583 F.3d 45, 52-53 (1st Cir. 2009)

("[A]fter the entry of a default a defendant may still contest a claim on the ground that the

complaint does not allege facts that add up to the elements of a cause of action." (citation and

internal quotation marks omitted)); Gowen v. F/V Quality One, 244 F.3d 64, 67 n.2 (1st Cir.

2001) ("The default judgment is conclusive as to facts but does not always defeat later legal

objections); Conetta v. Nat'l Hair Care Ctrs., Inc., 236 F.3d 67, 75-76 (1st Cir. 2001); Bonilla v.

Trebol Motors Corp., 150 F.3d 77, 80 (1st Cir. 1998).[2]

Accordingly, the court briefly summarizes the facts as deemed admitted and considers the

elements of each claim.

A.   Facts

Amyot created Spencer in July 2009.  Compl. ¶ 20 [#1].  Amyot served as Spencer's Vice

President and Director until November 2009.  Compl. ¶¶ 21-22.  As of November 2009, Max

Arella ("Arella") became Director, President, and CEO of Spencer.  Compl. ¶¶ 21-22.  Ian

Morrice ("Morrice") became Spencer's Vice President.  Compl. ¶¶ 21-22.  Amyot continued to

control Spencer after his resignation.  Compl. ¶ 23.  Shares of common stock in Spencer were

distributed to Arella, Morrice, and Hilbroy.  Compl. ¶¶ 35-36.  Additional shares were

distributed to an investment fund controlled by Amyot and a corporation controlled by Amyot.

Compl ¶ 36.  Beginning in December 2009, IAB entered into an agreement with Spencer to

---

[2] But see Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell v. Medfit Int'l, Inc., 982 F.2d 686,
693 (1st Cir. 1993) ("[A]n entry of a default against a defendant establishes the defendant's
liability."); Brockton Savings Bank v. Peat, Marwick, Mitchell & Co., 771 F.2d 5, 13 (1st Cir.
1985) ("[D]efault having been entered . . . each of [plaintiff's] . . . claims must be considered
established as a matter of law.").  In KPS & Assocs., 318 F.3d at 23 n.13, the First Circuit
recognized that "the authorities are not uniform" on this point, but stated that the "prevailing
view" is that after default a "defendant may still contest a claim on the ground that the complaint
does not allege facts that add up to the elements of a cause of action.").

prepare press releases, arrange for internet publicity, and prepare research reports for Spencer in exchange for shares of common stock.  Compl. ¶ 38.

In November 2009, Amyot received an opinion letter from an attorney stating that 22 million shares of Spencer stock could be sold to another corporation without a registration certificate.  Compl. ¶ 119.  This opinion letter was based on false information provided to the attorney by Amyot.  Compl. ¶ 119.  In reality, because the other corporation was also controlled by Amyot, the companies were affiliated, and no exception to the registration requirement existed.  Compl. ¶ 120.  On January 2010, Spencer transferred 22 million shares of stock to the receiving company.  Compl. ¶ 121.  The transfer papers were signed by Amyot.  Compl. ¶ 121. In March 2010, 12 million of these shares were deposited into an investment fund controlled by Amyot.  Compl. ¶ 122.  No registration statement was ever filed for these shares.  Compl. ¶ 123.

In March 2010, Spencer filed an initial Company Information and Disclosure Statement with OTC Links, a penny-stock exchange.  Compl. ¶ 39.  This statement included false information about Spencer's alleged business activity and development of new pharmaceuticals. Compl. ¶ 39.  This information was false and misleading; Spencer had no business activity save one contract for research concerning a patent that had previously been denied by the U.S. Patent and Trademark Office.  Compl. ¶ 39.  The statement also falsely asserted that Spencer was headquartered in Boston, Massachusetts.  Compl. ¶ 40.  Spencer had no physical presence in Boston; Spencer maintained only a "virtual office" in Boston.  Compl. ¶ 41.  Amyot set up this virtual office.  Compl. ¶ 41.  All of Spencer's mail was forwarded automatically to Hilbroy. Compl. ¶ 41.

Beginning in June 2010, Defendants released a number of press releases providing false information about Spencer.  Amyot drafted many of these press releases which were published

by Arella or Morrice.  Compl. ¶ 41(a).  IAB posted articles about Spencer online.  Compl. ¶ 41(b).  IAB and Hilbroy, acting under Amyot's control, also paid other companies to publish reports about Spencer online and to distribute information about Spencer to their e-mail subscribers.  Compl. ¶ 41(c).  The information published was false.  Compl. ¶ 42.  For example, throughout the summer and fall of 2010, Defendants published press releases about Spencer's alleged research into innovative drug delivery systems and the positive effect this research would have on its stock price; in reality, no such research existed.  Compl. ¶¶ 43-49.  On many days when public statements were released, Amyot sold shares of Spencer's common stock through investment funds under his control.  Compl. ¶¶  40, 42, 47.

The stock price during this time period rose from $0.20 per share to $0.30 per share resulting in Amyot controlling stock worth more than $3.2 million dollars.  Compl. ¶ 50.

In November 2010, Defendants began issuing press releases regarding purported offers from foreign investment firms to buy Spencer.  Compl. ¶¶ 51-63.  By the end of November, the press releases alleged that a Kuwaiti-based company, Al-Dora Holdings ("Al-Dora"), had made a $245 million buyout offer and agreed to give Spencer a $500,000 non-refundable deposit.  Compl. ¶ 60.  The $500,000 deposit was actually paid by Hilbroy, not Al-Dora.  Compl. ¶ 85.

During this same time period, Defendants continued to issue press releases lauding the positive performance of Spencer's stock, which as a result climbed to $0.60 a share by November 12, 2010.  Compl. ¶¶ 58-59.  Amyot made several sales of Spencer stock throughout this time period.  Compl. ¶¶ 53, 58, 59-63.

On December 10, 2010, a press release was issued stating that the buyout offer had been formalized and would close in March 2011. Compl. ¶ 66.  Then, in March 2011, Spencer issued a press release stating that an extension on the buyout offer was necessary.  Compl. ¶ 75.

Subsequently, in September 2011, Spencer issued a press release stating that negotiations had ceased.  Compl. ¶ 76.  No buyout ever occurred.  Compl. ¶ 76.

Defendants knew throughout the entire period of issuing press releases that the buyout offer was fictitious.  Compl. ¶ 78.  At the same time that Defendants began publishing press releases regarding the alleged buyout, Spencer's interim financial statement showed liabilities of approximately three times greater than its assets and a shareholders' deficit of more than $17 million.  Compl. ¶ 88.  Defendants' claim that they had conducted due diligence of Al-Dora was false.  Compl. ¶¶ 79-83.  Although Arella and Morrica allegedly sent someone to Kuwait to meet with Al-Dora, that individual did not meet with any Al-Dora employees and the office building he identified as the company's location does not contain a business by that name.  Compl. ¶ 79.  Moreover, a Swiss firm hired by Spencer to evaluate the buyout offer found nothing in the public domain to confirm the existence of Al-Dora.  Compl. ¶ 80.  The buyout offer allegedly sent from Al-Dora was actually an offer form given to Defendants by an attorney who was paid by Amyot.  Compl. ¶ 84.  The form was filled out by Arella or Morrice.  Compl. ¶ 84.  The $500,000 non-refundable deposit allegedly from Al-Dora actually came from Hilbroy, acting under the control of Amyot.  Compl. ¶ 85.  Press releases supposedly authored by Al-Dora's subsidiary regarding the buyout were actually authored by Amyot.  Compl. ¶ 87.

As a result of selling Spencer stock during this time period, Amyot gained more than $5 million dollars in profit.  Compl. ¶ 58.

*B.  Counts I & II*

Count I asserts that all Defendants violated section 17(a)(1), (3) of the Securities Act, 15 U.S.C. §77q(a)(1), (3), which makes it unlawful "for any person in the offer or sale of any securities [in interstate commerce of through use of the mails] . . . to employ any device, scheme,

or artifice to defraud, or . . . to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

Count II asserts that all Defendants violated section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), which make it unlawful to, through interstate commerce, use of the mails, or the facility of any national securities exchange, "use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device." Count II further asserts that all Defendant violated Rule 10b-5(a), (c), 17 C.F.R. § 240.10b-5(a), (c), which makes it unlawful to, through interstate commerce, use of the mails, or the facility of any national securities exchange, "to employ any device, scheme, or artifice to defraud, . . . or . . . to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the sale of any security."

Section 17(a)(1) has no scienter requirement, while section 17(a)(3) requires scienter. Aaron v. SEC, 446 U.S. 680, 697 (1980). Violations of section 10(b) and Rule 10b-5(a), (c) also required scienter. The First Circuit recognizes that gross recklessness is sufficient to satisfy scienter. ACA Fin. Guaranty Corp. v. Advest, Inc., 512 F.3d 46, 58 (1st Cir. 2008) ("[A] plaintiff may satisfy the scienter requirement with a showing of either conscious intent . . . or a 'high degree of recklessness.'" (quoting Aldridge v. A.T. Cross Corp., 284 F.3d 72, 82 (1st Cir. 2002)); Greebel v. FTP Software, Inc., 194 F.3d 185, 198 (1st Cir. 1999) ("It is accepted that recklessness may establish intent to defraud in . . . prosecutors under § 17(a)(1) . . . .").

The facts deemed admitted support liability for Amyot, Hilbroy and IAB. Here, the publication of false information in press releases was part of a larger course of conduct that began with the creation of a virtual Spencer office in Boston. See Swack v. Credit Suisse First

Bos., 383 F. Supp. 2d 223, 239 (D. Mass. 2004) (explaining that scheme liability may involve misleading statements, if those statements are part of a broader scheme or course of conduct intended to defraud).  The creation of a virtual office gave the impression that Spencer was an operational, Boston-based biotech company, although the company had no actual presence and all mail received was forwarded to Hilbroy.  The course of conduct continued through multiple months of false press releases, and culminated in the creation of a fictitious buyout offer. Hilbroy paid $500,000 to make it appear as though Al-Dora had put a non-refundable deposit down on the buyout offer.   This was done at Amyot's direction.  Despite knowing that Al-Dora had not actually paid the deposit, Amyot and IAB continued to draft and publish press releases regarding the fictitious buyout.

The facts also support liability as to Spencer.  The false and misleading press releases were issued under Spencer's name, and listed Spencer's officers and directors—Arella and Morrice—as contacts.   Spencer presented itself as a Boston-based company despite having no actual operations in Boston.  Spencer further created the impression that it owned valuable intellectual property that it did not in fact possess.  Finally, Spencer published information regarding the alleged buyout by Al-Dora despite not actually conducting due diligence on Al-Dora and despite having reason to know that no information about the company was available in the public domain.  As deemed admitted, the facts in the complaint show that Arella and Morrice either intentionally perpetuated this false information or acted with gross recklessness in failing to investigate the veracity of the buyout offer.  This scienter is attributable to Spencer.  See In re Cabletron Sys., Inc., 311 F.3d 11, 40 (1st Cir. 2002) ("The scienter alleged against the company's agents is enough to plead scienter for the company.").[3]

---

[3] Arella and Morrice entered into consent decrees with the SEC that admitted fault only as to

### C.  Counts III & IV

Count III alleges that Spencer and Amyot[4] violated section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2), which makes unlawful "for any person in the offer or sale of any securities (including security-based swaps) or any security-based swap agreement . . . to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact."  Count IV further alleges that Spencer and Amyot violated section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b), which makes it unlawful to, through interstate commerce, use of the mails, or the facility of any national securities exchange, "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."

The admitted facts sustain Amyot and Spencer's liability on these claims.  The complaint stated that Amyot drafted the press releases and controlled the entities through which they were released.  Spencer formally issued the press releases, and Spencer's officers were listed as the corporate contacts.  The press releases included false information about Spencer's research, assets, and a purported buyout offer of $245 million dollars.  These representations—shown to be false—would clearly be important to an investor.  See, e.g., Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (finding information to be material if there is "a substantial likelihood that a

---

negligence-based claims.  Nonetheless, in assessing default judgment against Spencer, the court takes the facts alleged in the complaint as admitted.  Those facts establish scienter.

[4] In its memorandum of law in support of the motion for default judgment, the SEC appears to suggest that Counts III and IV were also pleaded against Hilbroy and IAB.  See Pl.'s Mem. Law Supp. Mot. Default Judgments, Remedies, & Sanctions 15 [#182] (referring to liability of "the Amyot Defendants," elsewhere defined in the motion as Amyot, IAB, and Hilbroy).  However, the Complaint [#1] pleads Counts III and IV only against "Spencer, Amyot, Arella, and Morrice."  Accordingly, the court considers these counts only as related to Spencer and Amyot.

reasonable [investor] would consider it important" (quoting TSC Indus., Inc. v. Northway Inc.,
426 U.S. 438, 449 (1976)).  Moreover, as a result of these statements Spencer's stock price rose,
and through sale of Spencer stock, Amyot received more than $5 million dollars in profit.

   *D.  Counts V & VI*

   Count V alleges that IAB and Hilbroy are liable for aiding and abetting Spencer's
violations of section 17(a) of the Securities Act.  See 17 U.S.C. § 77o(b) ("[A]ny person that
knowingly or recklessly provides substantial assistance to another person in violation of a
provision of this subchapter . . . [is] in violation of such provision to the same extent as the
person to whom such assistance is provided.").

   Count VI alleges that IAB and Hilbroy are liable for aiding and abetting Spencer's
violation of Rule 10b-5.  See 15 U.S.C. 78t(e) ("[A]ny person that knowingly or recklessly
provides substantial assistance to another person in violation of a provision of this subchapter . . .
[is] in violation of such provision to the same extent as the person to whom such assistance is
provided.").

   The facts as deemed admitted establish liability for each of these counts.  Hilbroy
provided the $500,000 deposit that purportedly came from from Al-Dora.  Hilbroy also received
Spencer's mail, as Spencer did not actually have a presence in Boston.  These actions suffice to
show that Hilbroy aided and abetted in the scheme to misrepresent the nature of Spencer's
business and value of Spencer's assets to potential investors.  Similarly, IAB promoted Spencer
through posts on its website and the issuance of press releases containing false and misleading
information.  Both of these companies were controlled by Amyot, and thus his intentionality or
gross recklessness may be imputed to them for purposes of liability.  See In re Cabletron Sys.,
311 F.3d at 40.

E.  *Count VIII*[5]

Count VIII alleges that Amyot and Spencer violated section 5(a) of the Securities Act, 15

U.S.C. § 77e(a), which makes it unlawful to sell a security "[u]nless a registration statement is in

effect as to" that security.  Count VIII further alleges a violation of section 5(c) of the Securities

Act, 15 U.S.C. § 77e(c), which makes it unlawful to "directly or indirectly . . . offer to sell or

offer to buy . . . any security, unless a registration statement has been filed as to such security, or

while the registration statement is the subject of a refusal order or stop order or (prior to the

effective date of the registration statement) any public proceeding or examination."

The complaint establishes liability on this ground.  Amyot hired an attorney to provide an

opinion letter stating that 22 million shares of Spencer were eligible for a registration exemption,

and thus could be sold without being registered.  This opinion letter was based on false

information provided by Amyot.  No registration exemption was warranted.  These shares were

then sold by Spencer to another Amyot-controlled entity.  Twelve million shares were

subsequently transferred to an investment fund owned by Amyot.  These shares were never

registered.

V.    Remedies

A.  *Permanent Injunction*

Under section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and section 21(d)(1) of the

Exchange Act, 15 U.S.C. § 78u(d)(1), the court has authority to permanently enjoin a defendant

from future violations of securities law.  The court may permanently enjoin a defendant upon a

finding that there is "a reasonable likelihood of recidivism."  SEC v. Sargent, 329 F.3d 34, 39

---

[5] Count VII was dismissed by the SEC.  See SEC's Stipulation Voluntary Dismissal Seventh
Claim Relief [#156].

(1st Cir. 2003).  In determining whether there is a reasonable likelihood of recidivism, the court

may look to a number of factors, including: (1) the egregiousness of the past violation, (2) the

isolated or repetitive nature of the past violation, (3) the opportunity to violate again, and (4) the

recognition, if any, by a defendant that his acts were wrongful.  See id. (citations omitted).

Here, the scope and complexity of the scheme supports the need for a permanent

injunction.  Unlike a case involving a single misleading statement, the facts deemed admitted

show a long-term, calculated course of conduct intended to falsely inflate Spencer's stock price.

The facts further establish that Amyot orchestrated this scheme through use of the various

corporate entities that he controlled, including Hilbroy, IAB, and Spencer.  On these facts, the

court finds that there is a reasonable likelihood of a repeated violation by Amyot.  Moreover, the

court finds a reasonable likelihood that such a future violation would involve use of corporations,

such as IAB, Hilbroy, and Spencer, which operate under Amyot's control.  Accordingly, the

court will issue a permanent injunction as to Defendants Amyot, IAB, Hilbroy and Spencer.

### B.  Disgorgement

The court has discretion to enter an order of disgorgement in light of securities fraud.

SEC v. Happ, 392 F.3d 12, 31 (1st Cir. 2004).  Disgorgement may be in an amount reflecting "a

reasonable approximation of profits casually connected to the violation."  Id. (quoting SEC v.

First City Fin. Corp., 890 F.2d 1215, 1231 (D.C. Cir. 1989)).  "The risk of uncertainty in

calculating disgorgement should fall on the wrongdoer whose illegal conduct created that

uncertainty."  Id.

Here, a Securities and Exchange Commission Accountant provided a declaration

detailing the profits made from sale of Spencer stock by funds controlled by Amyot for the time

period from November 4, 2010 through March 16, 2011 (from the first press release announcing

the purported buyout until the press release stating that the buyout would not close on schedule). See Decl. Trevor Donelan [#183] [hereinafter Donelan Decl.].  In whole, the profit gained during this time period was approximated at $5,242,634.67.  Id. ¶ 6, Ex. A.  The declaration further established that $3,055,890.80 of that amount was transferred by Amyot to accounts held in Hilbroy and IAB's names.  Id. ¶ 7, Ex. A.

Accordingly, the court finds that the SEC has justified disgorgement against Amyot in the amount of $5,242,634.67.  Of this amount, Hilbroy and IAB are jointly and severally liable for $3,055,890.80, while Amyot is individually liable for the remainder.

*C. Prejudgment Interest*

"An award of prejudgment interest in a case involving violations of securities laws rests within the equitable discretion of the district court."  Riseman v. Orion Research, Inc., 749 F.2d 915, 921 (1st Cir. 1984).  In determining the appropriate amount of prejudgment interest, the court may consider "the willfulness of the . . . violation, . . . the length of time between the purchase and the repayment, and other circumstances of the case."  Id.  "Prejudgment interest, like disgorgement, prevents a defendant from profiting from his securities violations."  Sargent, 329 F.3d at 40.  Prejudgment interest rates are commonly calculated using the rate applied by the Internal Revenue Service to calculate underpayment penalties.  See I.R.C. § 6621(a)(2); SEC v. Druffner, 517 F. Supp. 2d 502, 512 (D. Mass. 2007).

Here, the SEC seeks prejudgment interest using this method of calculation for the period from March 16, 2011 through November 30, 2014.  See Donelan Decl. ¶ 11.  The SEC Accountant calculates the total prejudgment interest due from Amyot at $636,704.71.  Id. ¶ 11, Ex. I.  Of this amount, IAB and Hilbroy are jointly and severally liable for $371,130.20, while Amyot is individually liable for the remainder.  Id. ¶ 1, Ex. I.

13

The court finds these calculations justified, and awards $636,704.71 in prejudgment interest against Amyot, of which $371,130.20 in liability is to be joint and several with Hilbroy and IAB.[6]

### D.  Civil Penalties

Pursuant to section 20(d)(2) of the Securities Act, 15 U.S.C. § 77t(d)(2), and section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), a court may impose civil penalties for violations of securities law.  There is a three-tier system for civil penalties, with third-tier penalties available for individuals and entities that violate the securities laws in a manner that involves "fraud, deceit, manipulation, or deliberate and reckless disregard of a regulatory requirement; and . . . directly or indirectly resulted in substantial loss or created a significant risk of substantial losses to other persons."  See 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii).  For violations occurring after 2009, as adjusted for inflation, the maximum third-tier civil penalty available is equal to either the defendant's gross pecuniary gain or $150,000 per violation for natural persons and $725,000 per violation for other persons.  See id.; 17 C.F.R. § 201.1004, tbl.IV (2009).  In determining whether a civil penalty is appropriate, the court may take into consideration a defendant's ability to pay.  Druffner, 802 F. Supp. 2d 293, 298 (D. Mass. 2011).

Here, the facts deemed admitted show that Amyot orchestrated a complex and long-lasting fraud to manipulate the stock price of Spencer.  He achieved this scheme, in part, through controlling IAB, Hilbroy, and Spencer.  This scheme resulted in more than $5 million dollars profit, and ran the risk of causing significant loss to investors. In light of these facts, a significant

---

[6] The court does not extend the prejudgment interest period to September 2015 because the delay in entering judgment was not the fault of the Defendants.  The First Circuit has recognized that "where delay has occurred for which the [violator] was not responsible, courts have accommodated the equities" by crafting an appropriate prejudgment interest period.  Riseman, 749 F.2d at 921-22.

civil penalty is warranted against Amyot.  The court finds that a total civil penalty of $750,000 is appropriate.

The facts also warrant the imposition of a civil penalty against the various corporate entities that perpetuated this scheme.  However, it appears that IAB, Hilbroy, and Spencer are effectively defunct and without any significant corporate assets at this time.  Accordingly, the court finds that the civil penalty imposed must balance these entities' current lack of funds with the need to ensure that, if the entities are later recapitalized, they will not escape liability for their securities violations.  Accordingly, the court imposes a civil penalty of $150,000 each on IAB, Hilbroy, and Spencer.

### E.  Officer/Director Bar

Under section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), the court may bar an individual found guilty of securities law violations from serving as an officer or director of a public company.  This officer/director bar may be imposed "conditionally or unconditionally, and permanently or for such period of time as [the court] . . . shall determine."  15 U.S.C. §§ 77t(e), 78u(d)(2).  The application of such a bar is within the court's "substantial discretion."  SEC v. Selden, 632 F. Supp. 2d 91, 96-97 (D. Mass. 2009).

The court finds that Amyot engaged in a long-standing scheme to create the false impression that Spencer was a Boston-based biotech company with significant intellectual property that was to be bought out in a multi-million dollar deal.  In reality, Spencer did not operate in Boston, had no significant assets, and no buyout was ever planned.  This egregious pattern of behavior including use of multiple corporate forms under Amyot's control to manipulate the market through presentation of false information.  Ultimately, the scheme

resulted in more than $5 million dollars in profit for Amyot.  Moreover, the court has already determined that there is a reasonable risk of recidivism.  These facts support imposition of an officer/director bar.  Accordingly, the court imposes a permanent ban on Amyot serving as an officer or director of any public company.

### F.   Penny Stock Bar

Pursuant to section 20(g)(1) of the Securities Act, 15 U.S.C. § 77t(g)(1), and section 21(d)(6)(A) of the Exchange Act, 15 U.S.C. § 78u(d)(6)(A), the court also has discretion to prohibit a person from offering to sell penny stocks.  This bar may be "conditional[] or unconditional[], and permanent[] or for such period of time as the court shall determine."  15 U.S.C. §§ 77t(g)(1), 78u(d)(6)(A).  Here, Spencer's stock was traded as a penny stock.  Given Amyot's role in the scheme to falsely inflate Spencer's stock price, his resulting profits, and the reasonable likelihood of recidivism, the court finds that permanently prohibiting Amyot from trading any penny stocks is warranted.

### G.   Sanctions

The SEC further seeks sanctions against Amyot for both his failure to appear at trial and his conduct during the pretrial period.  Namely, the SEC argues that Amyot brought meritless objections regarding the authenticity of certain documents, unnecessarily requiring the court to hold (and the SEC to spend time and resources preparing for) an evidentiary hearing on this issue.  Amyot then failed to appear at trial as scheduled.

As to the pretrial evidentiary hearing, the SEC seeks sanctions in the form of $7,700 in attorney's fees for twenty-two hours spent preparing for this hearing and $1690.42 in expenses related to bringing witnesses to testify at the hearing.  As to Amyot's failure to appear at trial, the SEC seeks $10,850 in attorney's fees for thirty-one hours of final trial preparation during the

weekend before trial.  The SEC further seeks $19,030.93 in costs related to preparing exhibits and video depositions for trial.

The court declines to adopt monetary sanctions related to the November 2014 evidentiary hearing.  A defendant has the right to require a plaintiff to prove every aspect of their case. Although Amyot's authentication challenge was unsuccessful, the court cannot speculate as to whether this authenticity challenge was made in bad faith or whether, as a *pro se* litigant, Amyot mistakenly believed the challenge had some merit.  In any case, Amyot appeared at that hearing as required and cross-examined the SEC's witnesses.  In the absence of any dereliction of the court's orders, the court finds no ground to sanction Amyot in relation to this hearing.

Moreover, the court will not sanction Amyot by requiring him to pay the costs of the SEC's preparation of video depositions and exhibits intended for use at trial.  As the plaintiff in this civil enforcement action, the SEC had the burden of proving each of the elements of its claims at trial.  Money expended towards that end would have been spent whether or not Amyot timely appeared for trial.  The court finds no ground to require payment of these expenses by Amyot.

However, the court finds that Amyot could have provided the SEC and the court with at least one day's notice of his intention not to come to trial.  Because Amyot is resident in Quebec, to appear at trial on Monday November 17, 2014, he would reasonably have had to leave his residence as least as early as Sunday November 16.  When he chose not to depart, Amyot could have informed the SEC's attorneys, who were diligent in ensuring throughout this litigation that they remained in close contact with Amyot as a *pro se* litigant who did not have access to the court's ECF system.

If Amyot has informed the SEC in a timely manner of his decision not to appear at trial, the SEC's attorneys could have avoided pretrial preparations on November 16, 2014. Accordingly, the court will award a sanction in the amount of 15.5 hours of attorney's fees, which represents one half of the work done over the two-day weekend before trial. Specialized Plating, Inc. v. Fed. Environ. Servs., Inc., No. 97-1343, 1997 WL 414102, at *1 (1st Cir. 1997) (unpublished) (finding sanction for failure to appear at trial warranted), Fed. R. Civ. P. 16(f) (allowing for sanctions for failure to obey a scheduling order).

The SEC requests a lodestar fee rate of $350.00 per hour for the work done by its attorneys. The court finds this rate reasonable. Both SEC attorneys in this case exhibited a high degree of knowledge, skill, and ethics throughout all proceedings before this court. Moreover, both attorneys have significant educational and professional experience warranting an hourly rate of at least $350. See Decl. James R. Drabick, Esq. Supp. Request Attorney's Fees & Costs ¶¶ 2-4 [#184]; Decl. Rua M. Kelly, Esq. Supp. Request Attorney's Fees & Costs ¶¶ 2-4 [#185]. The SEC has also cited a number of orders from courts both inside and outside of this district finding rates of $350 or more to be reasonable for work done by SEC attorneys. See Pl.'s Mem. Law Supp. Mot. Default Js., Remedies, & Sanctions, Ex. E [#182].

Accordingly, the court will award a sanction for Amyot's failure to appear at trial in the amount of 15.5 hours of attorney's fees charged at a rate of $350 per hour. The total amount of this sanction is $5,425.

V.  Conclusion

As set forth above, the SEC's Combined Motion for Default Judgments, Remedies, and Sanctions [#181] is ALLOWED. In light of this allowance, the SEC's prior Motion for Default

Judgments [#120] is DENIED AS MOOT.  Final judgment will enter by separate order as to each defendant as follows:

1. Amyot is held liable for disgorgement in the amount of $5,242,634.67 and prejudgment interest in the amount of $636,704.71.  Of this amount, liability is joint and several with IAB and Hilbroy for $3,055,890.80 in disgorgement and $371,130.20 in prejudgment interest.  Amyot is individually liable for the remainder.  Amyot is further liable for $750,000 in civil penalties and for a $5,425 sanction for failing to appear at trial.  Post-judgment interest will be assigned at the rate provided by law.  Further, Amyot is permanently enjoined from future violations of securities law, from trading penny stocks, and from serving as an officer or director for any publicly traded company.

2. IAB is held jointly and severally liable for $3,055,890.80 in disgorgement and $371,130.20 in prejudgment interest.  IAB is further liable for a civil penalty of $150,000 and is permanently enjoined from future violations of securities law.  Post-judgment interest will be assigned at the rate provided by law.

3. Hilbroy is held jointly and severally liable for $3,055,890.80 in disgorgement and $371,130.20 in prejudgment interest.  IAB is further liable for a civil penalty of $150,000 and is permanently enjoined from future violations of securities law.  Post-judgment interest will be assigned at the rate provided by law.

4. Spencer is held liable for a civil penalty of $150,000 and is permanently enjoined from future violations of securities law.  Post-judgment interest will be assigned at the rate provided by law.

 IT IS SO ORDERED.

September 30, 2015                                                    /s/ Indira Talwani
                                                                               United States District Judge